**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Diamond A Ranch, Western Division, L.L.C., *et al*,<br><br>Plaintiffs,<br><br>v.<br><br>Chad F. Wolf, *et al*,<br><br>Defendants. | Civil Action No.: 20-3478 |

**DECLARATION OF SAGE GOODWIN IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, Sage Goodwin, hereby declare as follows:

1. I am a Business Manager for Plaintiffs Guadalupe Ranch Corporation and Diamond A Ranch, Western Division, L.L.C. (collectively, the "Ranch"). My partner, Sadie Hadley, is the Ranch's other Business Manager.

2. In my capacity as Business Manager, I am responsible for the Ranch's engagement with border wall construction efforts in the Guadalupe Canyon region.

3. The Ranch owns land in Arizona along the border between the U.S. and Mexico. Part of the Ranch's Southern border abuts the Roosevelt Reservation, a sixty foot-wide strip under federal government control.

4. The federal government is constructing a border wall on the Roosevelt Reservation in Arizona.

5. I am personally aware of numerous federal agencies' activity at the Ranch, including but not limited to operations by the Department of Homeland Security ("DHS"), Customs

and Border Protection ("CBP"), and the United States Army Corps of Engineers ("USACE") (collectively, the "Agencies"). I am also familiar with the work carried out by the Agencies' contractor, Southwest Valley Constructors, and its subcontractors (collectively, "SWVC"). I make this declaration based on personal knowledge.

**I. The Ranch**

6. The Ranch is a national model of conservation ranching that balances commercial operations, the preservation of traditional ranch life and customs, scientific research, healthy, resilient wildlife habitat, and a commitment to preserving open space.

7. The Ranch's land includes Guadalupe Canyon. Guadalupe Canyon is known for the continental significance of its floral and faunal diversity. It is a particularly intact example of rare canyon riparian woodland habitat, and a vital component of the only contiguous link between the habitats of the Sierra Madre in central Mexico and the Rocky Mountains.

8. Numerous rare and unique animals are found here. These species include jaguar, jaguarundi, ocelot, New Mexico ridge-nosed rattlesnake, Mexican spotted owl, Northern goshawk, Chiricahua leopard frog, Gould's Turkey, Mexican gray wolves, and lesser long-nosed bats.

9. Guadalupe Canyon functions as a key wildlife corridor connecting ecosystems in Arizona, New Mexico, and Mexico. In this arid climate, the availability of water is key to survival, and water sources are few and far between. Guadalupe Canyon often provides sufficient access to water to permit migration from Mexico into the United States and vice versa.

## II. Intrusions Begin

10. During my tenure at the Ranch, we have had a cooperative relationship with CBP. We have consistently supported efforts to improve security on the border and deter illegal immigration. We have provided CBP with information on our employees, reported suspicious activity, and allowed its agents access to the Ranch. For example, we give CBP agents the codes to the locked gates that bar public access to our private roads.

11. When CBP wanted to enter the Ranch for purposes other than patrolling, it would negotiate with us for a right of entry ("ROE"), which we would sign. CBP agents were essentially neighbors.

12. We first heard from Paul Enriquez in the summer of 2019, when he invited "Stakeholders," including property owners on the border, to a meeting to discuss potential border wall projects.

13. In February 2020, our relationship with CBP began to deteriorate.

14. On the morning of February 18, 2020, we heard from other landowners that a team from the Agencies planned to visit Guadalupe Canyon to plan the border wall. I objected to the team's entry without any notice or authorization. In particular, I expected them to seek a ROE prior to entry. I reached out to Agent Sherrick, Supervisory Agent Matthew Bowers, and Supervisory Agent Corrales. I ultimately left a voicemail for Agent Benito Teran, who I understood was guiding the team.

15. Later that afternoon, I learned that a construction/surveying team from USACE, along with CBP and SWVC personnel, had entered the Ranch's property in Guadalupe Canyon without notice or an ROE.

16. The following morning on February 19, I met Mr. Enriquez in person at the Border Patrol's Douglas Station. I again objected to the entry without an ROE. I received his

contact information a few days later, and given the Ranch's experience with flooding, I asked his assistance to get in touch with the engineer working on flood management and barrier gates. He agreed to do so the same day. A copy of this email is attached as Exhibit A.

**III. Public Comment**

17. On March 16, 2020, CBP announced that it was seeking public input regarding new border barrier projects in Cochise County, Arizona, which fell within its Tucson Sector. The announcement said that "CBP is conducting environmental site surveys and assessments and is gathering data and input from . . . landowners that may be affected by or otherwise have an interest in the projects. CBP will prepare environmental planning documents to evaluate potential environmental impacts and make those documents available to the public." A copy of this announcement is attached as Exhibit B.

18. The final page of this announcement included a map showing a new segment of new border barrier, beginning at the border between Arizona and New Mexico and continuing west for 4.7 miles. I realized that this segment ran directly south of the Ranch's property. The Ranch is the sole private landowner on this stretch.

19. At the time, I took CBP at its word that it would consider public input in making its border wall plans.

20. On March 20, I attempted to engage Mr. Enriquez and the USACE on flood management issues. A copy of this email is attached as Exhibit C.

21. On March 23—before any public comments were considered—USACE awarded a $524 million contract modification to SWVC to design and build the border wall. A copy of the press release announcing this award is attached as Exhibit D.

22. The next day, I emailed Mr. Enriquez to express my concern that I had not received any ROE applications for the Ranch. A copy of this email is attached as Exhibit E.

23. Loud government helicopters began to overfly the Ranch around this time, frightening the livestock.

24. My family and I submitted a comment on May 15, 2020. The comment letter described our history with the land. A copy of this letter is attached as Exhibit F. It specifically made two objections: first, that wall construction would result in a construction footprint well outside of the Roosevelt Reservation; and second, that the proposed wall design could cause excessive flooding in Guadalupe Canyon.

25. On May 27, we received an email from SWVC notifying us that USACE and CBP had ordered construction in the Roosevelt Reservation adjacent to the Ranch. A copy of this email is attached as Exhibit G.

26. CBP's "Outreach Team" responded to our public comment with a form-like email on June 30, 2020. The email claimed that the feedback would be detailed in a report made public on CBP's website. It made no response to the Ranch's concerns about collateral damage from blasting. A copy of this email is attached as Exhibit H.

**IV. The Terrain**

27. The Ranch's property is best understood on a map. Attached as Exhibit I is a map of the Ranch's property and the broader area. This litigation focuses on entirely on a small rectangle in the Southwest corner of the map.

28. To further assist the Court, we created a map using Google Earth that notes some of the key features on the Ranch. A PDF copy is attached as Exhibit J. Although the Ranch's boundaries are only approximate, the key features are labeled accurately.

29. There are five key features labeled on the map. First, there is a small hill, which we have labeled as Apache Lookout, on the west side of the map. Second, there is a private road in close proximity to Guadalupe Creek. This Creek flows down into the Proposed Culvert location. Finally, there is a mountain that both we and the Agencies call Shadow Mountain.

30. The portions of the Ranch adjacent to the Roosevelt Reservation are rugged and remote terrain that is very difficult to cross on foot, let alone to build on. Grades vary from completely flat to up to ninety percent.

31. To lay the foundation for a wall and related roads on steeply sloped terrain, SWVC appears to be using three basic steps. First, subcontracted drilling and blasting engineers drill dozens of holes within a small area and insert hundreds of pounds of explosives. They then detonate the charges, caving steep terrain into fractured rubble. Second, they use heavy equipment to level the terrain and build a retaining wall. Finally, once they have a reasonably flat surface, at a suitable grade capable of supporting construction vehicles and the wall, they begin actual construction.

## V. Construction Begins

32. In the summer of 2020, a small army of construction vehicles, including heavy tracked equipment, assembled on federal land to the west of Guadalupe Canyon. Massive explosions and percussions of enormous jack hammers came closer and closer to the Ranch.

33. Construction along the Ranch's property began in early July 2020. By late July, construction operations on Apache Lookout were causing clouds of dust, shrapnel, and car-sized boulders to tumble down from Apache Lookout and onto Ranch property.

34. SWVC sent us plans for the wall adjacent to the Ranch on July 28. They included a set of "General Conditions" that required SWVC to "dispose of all construction debris and other waste material off the government owned land at an approved off-site disposal area . . . within 72 hours." These General Conditions also required SWVC to mark the perimeter of all areas to be disturbed during construction activities "to prevent unnecessary impacts" and prohibited any disturbance outside that perimeter "unless otherwise approved." A copy of this email and attachment are attached as Exhibit K.

35. As construction entered Guadalupe Canyon, SWVC, CBP, and USACE agents began to drive on and drop construction debris on Ranch property without seeking or obtaining permission from the Ranch.

36. Agency and SWVC personnel made ground markings to show the limits of the Roosevelt Reservation before construction began. The ground markings, however, were soon missing or obliterated by debris and the tracks of construction vehicles crossing onto Ranch property.

37. The Agencies and SWVC marked the boundaries of the Roosevelt Reservation again in August 2020, months after construction commenced and after Plaintiffs' concerns were raised in a letter from United States Senators Martin Heinrich and Tom Udall. Since then, many of the boundary markings have again been buried under new rubble.

38. The Agencies did not effectively train construction personnel to respect the Ranch's property. In August, Ms. Hadley received a message from a surveyor who recounted his experience with one of Defendants' contractors while working for the Ranch on Ranch property:

> [W]e were intercepted on private land by a contractor. He stated we could not be going the direction we were, due to the excavator working up on the hill and the dangers involved. I informed him that he was trespassing and on private land. I also noticed he had flagged some trees and asked him why he was doing that. He said he was marking areas so that they had future sites to store their equipment. At that point I told him that the land owner would not probably want them storing anything on the property and that they needed to keep to their 60-foot easement. He made a remark about the government basically being able to do whatever they wanted, and I indicated that that was false and they needed to keep their equipment and people off of the private land. I was nice, and diverted our course over a hill to the parked truck to avoid confrontation, but I left him with a basic knowledge of where the private property was, and that he should not be where he was.

A copy of this email is attached as Exhibit L.

**VI. Objections and Promises**

39. On August 19, Senators Martin Heinrich and Tom Udall sent a letter to the heads of CBP and the Department of Defense raising various objections to continued construction, including our concerns regarding impacts off the Roosevelt Reservation and the possibility of damaging flash floods. A copy of this letter is attached as Exhibit M.
40. This letter seemed to finally get results. Six days later, Mr. Enriquez wrote to me. He noted our concerns that construction contractors had gone outside the Roosevelt Reservation. A copy of this email is attached as Exhibit N.
41. I responded via email several days later that "SWVC has been operating outside the Roosevelt easement. We have seen the tracks of heavy equipment on our property, and

the blasting has dropped large, sometimes car-sized boulders on our property." I requested that work stop "until the boundary is determined and we have agreed on a remedy for past violations." A copy of this email is attached as Exhibit O.

42. During September, Mr. Enriquez promised us that the intrusions and rockfalls on the Ranch would stop.

43. On September 10, Ms. Hadley and I met with Mr. Enriquez and a group of other government and SWVC representatives. We reviewed wall construction on the Ranch, and discussed the key points of concern. Mr. Enriquez and a senior government contractor promised us that the debris incursions were "unacceptable" and that no further incidents would occur. My email summarizing this meeting is attached as Exhibit P. No one on the government side has ever contradicted my summary of the statements and promises made.

44. These promises had no immediate effect. In early October, SWVC blasted off the top of the elevated feature we call Apache Lookout. Attached as Exhibits Q and R are emails and attachments showing blast plans and reports for October 5, 2020. One of the reports—likely the report describing blasting on "Max's Perch"—corresponds to video of the October 5 explosion, https://www.youtube.com/watch?v=1uxRT9edi5E&feature=youtu.be, and its aftermath, https://www.youtube.com/watch?v=xTUNNqmKX_c&feature=youtu.be. These videos are identified in the Kurc Declaration at paragraphs 14 and 15.

45. Mr. Enriquez finally responded to my September email a month later, on October 14. Despite the blasting at Apache Lookout, he reiterated his concern and put specifics behind his promises. A copy of his message is attached as Exhibit S.

46. Mr. Enriquez addressed our concern about post construction restoration and rehabilitation. He described remediation standards, including placing native seed mix on affected areas to revegetate the land, restore the original grade, replace original soils, and restore proper drainage. He did not explain how that could be done on the rubble fields already created.

47. Mr. Enriquez also assured us that additional rockfall could be stopped: "Regarding your concerns for rock fall and damage to your property and the landscape, the construction contractor has developed plans to catch debris and contain rocks to the pioneered sections of the Roosevelt Reservation." He described the plan in detail. The specificity of the plan and Mr. Enriquez's commitment to it were encouraging. We hoped that the issue had finally been resolved.

## VII. Broken Promises and Misrepresentations

48. We were mistaken. In fact, the pace and impact of blasting seemed to increase. In October, SWVC caused major explosions that blasted construction debris onto Ranch property. I would guess that hundreds of tons of rocks, dust, and boulders were thrown down onto the Ranch from the Roosevelt Reservation.

49. We were troubled by the damage to our property near Apache Lookout, but hoped after receiving Paul Enriquez's message of October 14 that he had finally found a way to redeem the promises he made in September. In fact, his claim to have a plan to control rockfalls was proven false almost immediately.

50. On October 22, SWVC carried out large explosions on Shadow Mountain. Attached as Exhibit T is an email attaching a blast plan for October 22, 2020. Mr. Enriquez received a copy of this and other plans, so it is likely that he knew or approved of the contractor's blasting plans—which were just a more aggressive version of what the contractor had

been doing for more than a month, despite Mr. Enriquez's assurances of September 10. This report corresponds to a video of the October 22 explosion, https://www.youtube.com/watch?v=WMWdTjLWJYU&feature=youtu.be. This video is identified in the Kurc Declaration at paragraph 6.

51. The blast report includes a check box for "Blast Mats." These mats prevent debris from explosions from leaving the area. The form indicates that there was no plan to use them to contain debris, despite past experience of rockfalls on Ranch property. I am not a blasting expert, but it appears to be that the report shows a plan to set off large amounts of explosives remarkably close to our property. It is hard to believe that anyone would think such a blast would not throw debris onto our land, as it clearly did.

52. As is obvious from John Kurc's October 22 video, the explosion threw large amounts of material down the slope onto our property. It is plain that neither the Agencies nor SWVC actually carried out the plans Mr. Enriquez described. We suspect that Mr. Enriquez and the contractor in fact created their plans to catch material for later use in road construction, rather than to help mitigate any impact on the Ranch. In any event, it has obviously failed to keep rock from being blown onto our property.

53. Thus, while Mr. Enriquez was reassuring us with statements that intrusions on our property were unacceptable, and citing plans to prevent them, he was simultaneously tolerating if not encouraging the contractor's acceleration of intrusions and damage to our property.

54. October 22 is just one example. The Kurc Declaration and related exhibits show the full scale of the damage to Apache Lookout, Shadow Mountain, and the surrounding land.

55. In addition to rockfall, the blasting posed a grave danger; workers could not walk on our own land in the vicinity of the construction during the many months when blasting was under way. Even in the absence of rockfalls and floods and physical intrusions, this is an interference with our productive use of our own land.

56. The Agencies have not made effective efforts to carry out the remediation described by Mr. Enriquez on October 14.

57. As is obvious from the photographs and videos, no remediation is likely to be effective.

**VIII. The Risk of Flooding and the Lack of Data to Prevent It**

58. Falling debris is only one of the risks to Ranch property from the Agencies' actions.

59. Guadalupe Creek, which flows through Guadalupe Canyon and across the border into Mexico, presents a significant flooding risk.

60. Guadalupe Creek is an ephemeral stream, meaning that it is dry for much of the year. When enough rain falls, however, the Canyon can send a huge volume of water speeding down a narrow channel, carrying trees, boulders, and even animals in its wake.

61. The creation of a border wall sufficient to stop illegal crossings will necessarily impede the flow of water, even if some of the fencing that prevents illegal entry from Mexico can be theoretically removed during flood events. In particular, the culverts must be large enough to permit the downstream passage of entire trees—rootball and all—at the height of the flood; otherwise the trees will block the culvert and boulders and other debris will quickly back up behind them, forming a dam.

62. The impounded waters will very likely affect the Ranch's access to the outside world. Guadalupe Creek runs alongside the Ranch's private road (the "Road") in the bottom of Guadalupe Canyon. The Ranch depends on the Road for access to food and hospitals.

The Ranch is an extremely isolated setting—without reliable internet or cellular communications—and the ability to leave to seek help is critical.

63. During a flood, backed-up waters could also cause the culverts to fail suddenly, releasing the floodwaters into Mexico and dramatically eroding, or head-cutting, the Ranch's bottomlands, with their high-quality forage (the plant material consumed by grazing livestock). Flooding events can directly reduce the Ranch's income and value.

64. In September 1969, a flood drowned more than 20 head of cattle and swept them far into Mexico.

65. I have lived on or frequently visited the Ranch for decades, and have personally witnessed other destructive flooding events. I am familiar with the following events:

66. In the 1980s, floodwaters knocked out the Road for more than six months. Residents were only able to use the Ranch because they could ride horses to the end of the canyon to access parked vehicles.

67. In September 2014, the Ranch experienced extraordinary flooding that washed out the Road.

68. Most recently, the Ranch received six inches of rain over two days during Thanksgiving 2019. The rain led to historic flood stage conditions in Guadalupe Creek, severely damaging the Road and transporting large quantities of debris, including enormous tree trunks and boulders.

69. These events occurred in the absence of any obstruction on the border.

70. The evidence behind and the design of a culvert allowing water to pass under the border wall is thus of critical interest to the Ranch's ability to continue to use the Road, and indeed its ability to operate at all.

71. Between February and the present, we have provided the Agencies with information on rainfall events and resulting floods. The rainfall in Guadalupe Canyon can be significantly different from rainfall in the areas around it, and the Ranch likely has the best rainfall records for the canyon. The Agencies did not request this information.

72. Our understanding of the current culvert design comes from a July 22, 2020 email from SWVC describing "a set of 7 concrete box culverts extending across the channel with each cell 12' wide ranging in height from 10' to 14'." A copy of this email is attached as Exhibit U.

73. This design is inadequate to prevent flooding. There is an unacceptable likelihood that trees will be swept downstream in a flood that are far longer than 12'. In fact, there are multiple tree trunks far longer than this already lying in the floodplain. There is a risk that these trees will be caught across the culverts, and debris will back up behind them.

74. Between February and the present, we have made multiple attempts to engage with the Agencies to understand the basis for their proposed culvert design.

75. None of these attempts were successful.

76. Mr. Enriquez has referred us to CBP's Environmental Stewardship Plan ("ESP") as providing support for these culvert designs. A copy of the most recent version of this ESP is attached as Exhibit V.

77. The ESP includes a single paragraph about attempts to mitigate the risk of flooding. It recites that "CBP will coordinate with the construction contractor to consider these impacts and develop a barrier design that includes footings flush with ground, as well as culverts and gates in drainages to maintain continuous water flow and minimize debris build-up during flood events. Erosion and sediment control and storm water management

practices will be implemented during and after construction." Notably, the ESP does not say that the design will work, just that there will be coordination, consideration, and minimizing. These are simply more of the vague, reassuring boiler-plate generalities that Mr. Enriquez has offered in our other encounters. Based on our experience to date, we cannot afford to take these assurances at face value.

78. On September 30, we believed that we had made progress in trying to engage with the government before it took irreversible actions that put our property at risk. On a call with me and other stakeholders, USACE promised that it would share with us its hydrological studies for its culvert design with participants, including the Ranch. That was another promise the Agencies never fulfilled. None of the government's hydrological work has been made available for comment.

79. Mr. Enriquez's October 14 email instead asked us to give him any studies we might perform, said that the contractor was required to prepare an "initial drainage report," another study that has not been provided to us, and declared that under federal guidelines, "new infrastructure cannot create a change in water elevation greater than one foot beyond the Roosevelt Reservation." Again, that would be good news if the Agencies gave us enough information to judge whether their plan would actually achieve that goal and we could agree with the Agencies on the implementation of the plan. But so far that has not happened; like every other assurance in that message, it has proven to be meaningless.

## IX. Continuing Threat

80. When we saw the massive scale of the destruction in October, the Ranch's lawyers sent a formal letter complaining about all of the issues discussed above on November 9. A copy of this letter is attached as Exhibit W.

81. Mr. Enriquez responded two days later. A copy of his letter is attached as Exhibit X. He writes as if the blasting campaign of September and October never happened and offers the same protestations of concern and future compliance that he has offered every time we've dealt with him. He once again says there's a plan to stop intrusions using "tiered troughs and a berm." He doesn't deny our evidence that the plan has failed or not been implemented. Instead, he says,

> If, as noted in your November 10 letter, those measures have not been effective in controlling rockfall, CBP wants to take steps to address your concerns. CBP will engage with USACE concerning the rockfall issue, and I will follow-up with you once I have had the opportunity to have additional discussions with USACE.

82. So, after months of protests from the Ranch that our property interests were being harmed in real time and months of soothing talk and unfulfilled promises from the government, all that Mr. Enriquez offers is another assurance that CBP wants to take steps to address our concerns, and a promise to "engage" with USACE and "follow-up" with us. I no longer believe Mr. Enriquez's claims of concern, or his vague, unenforceable promises to do something about the continuing intrusions.

83. The Agencies have been blasting for months in the vicinity of Ranch property. The danger posed to people and livestock means that Ranch employees have been prevented from traveling through our own land in the vicinity of the construction during the many months when blasting has been under way. Even absent physical intrusions and floods, these bars are an interference with our use of our own land.

84. The Agencies have continued their blasting in the wake of our November 9 letter. Numerous news sources have reported that they are rushing to finish as much

construction as possible before the Presidential inauguration. Copies of these articles are attached as Exhibits Y through BB.

85. Even after blasting is complete, we believe the Agencies need to build large rock retaining walls up to 30 feet high to create the grade they need for further construction. This process will almost certainly lead to further debris intrusion on the Ranch.

86. The Agencies' failure to provide a single hydrological or drainage study supporting their Guadalupe Creek culvert design is alarming. Absent intervention, the risk of flooding on Ranch land will become unacceptably high.

87. Although we did not understand it at the time, in hindsight we agree with one of the sentiments expressed in various environmental groups' May 15, 2020 comment on the relevant border wall section. These groups described the public comment process as "a completely meaningless exercise," adding that the government's "prior actions clearly demonstrate that the agency has no intention of factoring public input into project planning or design." While we do not share some of these groups' categorical opposition to all border walls, we have shared their unhappy experience with the government's "engagement" process. A copy of this letter is attached as Exhibit CC.

88. The difference in our case is that the government has used claims of good faith and engagement not just to neutralize political opposition but to take away the Ranch's property rights. I now believe this is a conscious modus operandi, and that the Agencies will continue to offer sympathy and promises while construction barrels ahead, and they will do so for months into the future if they aren't stopped. We were lulled by Mr. Enriquez's assurances into thinking we would get a fair hearing.

89. We made repeated efforts to engage with the Agencies and SWVC over the course of nine months. All of these efforts have been met with what we now see as empty promises to "consult" with us or other agencies or further "consider" information. None of these promises have changed even the smallest detail of the Agencies' plan for the border wall. Construction has not slowed; if anything, it has accelerated. They certainly have not led to a good-faith and open exchange of information or to a fair hearing and engagement with an official who has the authority and intent to fairly accommodate our concerns before intruding on our property.

90. I hope the Court will intervene and stabilize the situation until the Agencies can provide us with the protections that U.S. citizens have a right to expect before the government intrudes on and damages their private property.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on Nov 29 2020

Sage Goodwin