# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DIAMOND A RANCH, WESTERN
DIVISION, L.L.C., *et al.*

       Plaintiffs,

       v.

CHAD WOLF, in his official capacity as
Acting Secretary of Homeland Security, *et al.*

       Defendants.

Civil Action No. 20-cv-03478-CRC

## REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................... 3

       A.     Defendants Had an Unambiguous Obligation to Provide Pre-Deprivation
              Process. ............................................................................................................. 3

              1.     Underlying Principles ............................................................................... 5

              2.     Congress has Required Defendants to Provide Pre-Deprivation Process... 6

       B.     Defendant's Latest Disclosures Suggest a Deep-Seated Lack of Respect for
              Plaintiffs' Rights. ............................................................................................. 9

       C.     Defendants' Treatment of the Ranch was Unconscionable. ................................ 12

II.    PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF
       INJUNCTIVE RELIEF .............................................................................................. 14

       A.     Defendants' Intrusions Justify Injunctive Relief. .................................................. 14

       B.     Defendants' Plans Pose Significant Risks ............................................................. 15

III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FACTORS FAVOR
       PLAINTIFFS ............................................................................................................. 17

CONCLUSION.................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andree v. Ashland County*,
   818 F.2d 1306 (7th Cir. 1987) ..................................................................................6

*Baugh v. City of Milwaukee*,
   823 F. Supp. 1452 (E.D. Wis. 1993), *aff'd*, 41 F.3d 1510 (7th Cir. 1994) ...............9

*Daniels v. Williams*,
   474 U.S. 327 (1986) ...................................................................................................5

*Hudson v. Palmer*,
   468 U.S. 517 (1984) ...............................................................................................5, 6

*N. Am. Butterfly Ass'n v. Nielsen*,
   368 F. Supp. 3d 1 (D.D.C. 2019) ..............................................................................4

*N. Am. Butterfly Ass'n v. Wolf*,
   977 F.3d 1244 (D.C. Cir. 2020) ........................................................................1, 4, 5

*N. Am. Butterfly Ass'n v. McAleenan*,
   No. 19-5052, 2019 WL 3996272 (D.C. Cir. Aug. 23, 2019) ....................................4

*Pharm. Research & Mfrs. of Am. v. United States*,
   135 F. Supp. 2d 1 (D.D.C. 2001) ............................................................................19

*Pitchford v. City of Earle*,
   No. 3:06CV00140 WRW, 2007 WL 3256851 (E.D. Ark. Nov. 2, 2007) ...............14

*Scott v. Conley*,
   937 F. Supp. 2d 60 (D.D.C. 2013) ............................................................................5

*Silverman v. Barry*,
   845 F.2d 1072 (D.C. Cir. 1988) ..............................................................................14

*United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cty., Tex.*,
   538 F. Supp. 2d 995 (S.D. Tex. 2008) ...................................................................7, 8

*United States v. 23.311 Acres of Land*,
   No. 7:19-CV-00407, 2020 WL 4724332 (S.D. Tex. Mar. 4, 2020) .........................8

*United States v. 5.65 Acres of Land in Starr County, Texas*,
   7:08-cv-00202, 2020 WL 5105206 (S.D. Tex. Aug. 31, 2020) ...............................8

*Wise v. Bravo*,
  666 F.2d 1328 (10th Cir. 1981) ............................................................................6

**Statutes**

8 U.S.C. § 1103 ..............................................................................................................7

40 U.S.C. § 3113 ............................................................................................................7

**Other Authorities**

Anita Snow, *Damage from border wall: blown-up mountains, toppled cactus*,
  Associated Press, Dec. 18, 2020 ....................................................................14

John Burnett, *Contractors Dynamite Mountains, Bulldoze Desert In Race to Build
  Trump's Border Wall*, NPR, Dec. 11, 2020.............................................................14

Nick Miroff, *Trump administration in all-out push to build border wall before
  election*, Wa. Post, Sept. 29, 2020 ........................................................................14

Simon Romero & Zolan Kanno-Youngs, *A Rush to Expand the Border Wall that
  Many Fear is Here to Stay*, N.Y. Times, Nov. 29, 2020 ...................................14, 18

Southwest Border: Information on Federal Agencies' Process for Acquiring
  Private Land for Barriers,Government Accountability Office, GAO-21-114
  (Nov. 17, 2020)........................................................................................................8

U.S. Drug Enforcement Administration, DEA Programs: High Intensity Drug
  Trafficking Areas (HIDTAs) ....................................................................................18

United States Department of Justice, Justice Manual, ENRD Resource Manual, 9-
  Point Program for Settlement or Dismissal Within One Year (2018) ......................7

## INTRODUCTION

Defendants' Opposition[1] to Plaintiffs' Motion[2] is most notable for what it omits. Defendants fail to discuss or even cite the procedural due process case most squarely on point: *North American Butterfly Association v. Wolf*.[3]  Just two months ago, the D.C. Circuit held in *North American Butterfly* that the government violates due process when it intrudes without permission on a landowner's property to build the border wall.  Defendants also fail to address Congress's enumeration of the process landowners are due in such cases—process that includes negotiations and potential condemnation in court.  Nor do Defendants address their own long history, in dealings with Plaintiffs and in constructing the border wall elsewhere, of following Congress's guidance and negotiating for rights of entry prior to intruding on private property.

Defendants' failure to address these sources of law is fatal to their claim that due process has not been violated here. Indeed, it is fatal to the rest of their defense too, for they equally fail to address the cases from this jurisdiction holding that a violation of the Constitution is irreparable injury by itself and that the public interest is never served by permitting such violations.

Defendants' arguments against an injunction rely on breaking the harms into pieces and dismissing them as not requiring injunctive relief.  In Defendants' view, it's too late to stop the blasting, too early to stop the flooding, and just not that important to stop continuing rockfall.  That piecemeal approach ignores the fact that these violations are all the products of a single course of conduct:  a deliberate refusal to use established due process mechanisms when conducting

---

[1] Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, ECF 20 (Dec. 15, 2020).

[2] Memorandum of Points and Authorities in Support of Plaintiffs' Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction, ECF 4-1 (Nov. 30, 2020).

[3] *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020).

activities on the Roosevelt Reservation that are likely to damage Plaintiffs' property. And that refusal caused harm to the Ranch's property in every case, as Defendants now belatedly admit.

Since before this litigation began, Defendants have been aware of another risk that their activity posed to the Ranch's property. It appears, from evidence submitted for the first time in their latest filing, that Defendants have dug a trench so deep, so steep, and so close to the Ranch's property that it appears likely to cave in, quite possibly taking Ranch property with it. Even without a collapse, the creation of a cliff at the edge of Ranch property poses a risk to people and livestock on the Ranch. It is inexplicable that Defendants have chosen to disclose the problem at this late date, and in such an abstract and obfuscated fashion. Plaintiffs have come to expect that Defendants would treat them with a mix of soothing blarney and sudden injury; they did not expect the same treatment in these proceedings.

In this light, it simply is not enough for the Court to order due process for risks that Plaintiffs already know about. By the nature of things, Plaintiffs will usually discover those risks only when they have already suffered an injury, one that Defendants will predictably say is too late to remedy with due process. Putting the burden on Plaintiffs to identify every potential harm being caused by fast-moving wall construction will reward Defendants for failing to disclose known risks. That is why it matters that Defendants are so late and so reticent in disclosing the consequences of their construction for the Ranch.

Defendants' arguments on the balance of harms and the public interest are also unavailing. Even a short pause in construction, Defendants argue, would add to the cost of the wall and undercut national security by allowing illegal immigrants and drugs to cross into the United States. Little weight need be given to cost in the context of constitutional rights. And the claim that national security turns on building this mile and a half of wall in this corner of the country is again

2

undercut by what the Defendants do not say.  They do not offer details about illegal entries in the rugged Peloncillo Mountains.  Instead, they offer consolidated illegal entry statistics for 262 miles of flat desert and urban terrain.  Both public reporting and the record in this case suggest that illegal crossings on this stretch of border were rare—perhaps a few dozen a year.  There are many ways to intercept those few dozen other than building a wall, and the need to rely on such measures for a few additional weeks is hardly a matter of national security.

At a minimum, Defendants should be required to observe Plaintiffs' rights in the future by obtaining a right of entry or other easement prior to taking any action that poses a risk of harm to the Ranch.  But that is not enough.  As long as Defendants can keep bulling forward with construction while ignoring harms to Plaintiffs, that is what they will do.  The only way to ensure that providing due process gets the same respect as completing another mile of wall is to bar Defendants from building more wall until they can represent to the Court that they have identified and negotiated with the Ranch over *all* the likely harms that wall construction poses to the Ranch's property.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    Defendants Had an Unambiguous Obligation to Provide Pre-Deprivation Process.

Defendants' argument on procedural due process has two prongs:  either (1) Plaintiffs deserve no process at all because they are complaining about acts of negligence or trespass, or (2) Plaintiffs deserve only the opportunity to sue for compensation after Defendants are done intruding on their land.  Defendants offer scant authority from the D.C. Circuit for either proposition—an omission that is particularly striking because the Circuit recently decided the case that most closely resembles this controversy.

In *North American Butterfly*, a landowner on the Southern border alleged that these Defendants and their contractors "entered, damaged and destroyed [its] private property without authorization or permission . . . in preparation for the construction of a border wall."[4] The District Court dismissed the complaint, explaining that it could not grant injunctive relief and that plaintiffs' remedy was limited to a Tucker Act action for damages.[5]

Defendants—represented by the same Justice Department attorneys as in this case—argued on appeal that the plaintiff had an adequate remedy after the fact in the form of just compensation. They contended that "[t]he Tucker Act already permits the Association to obtain just compensation as a remedy for a cognizable taking if and when one occurs, and so there is no basis for any equitable relief at this time."[6]

The D.C. Circuit reversed, holding that the plaintiff had a valid procedural due process claim for the intrusions on plaintiffs' property.[7] It explained that "a principal focus of procedural due process protection is the adequacy of governmental process 'before the owner is finally deprived of a protected property interest.'"[8]

*North American Butterfly* is directly on point and controlling here. First, Defendants' wrongful acts in *North American Butterfly* were also trespasses on the plaintiff's property. As the D.C. Circuit explained, Defendants allegedly "asserted control over the National Butterfly Center by entering, maintaining a regular presence on, and taking charge of areas of the Center without

---

[4] Amended Complaint ¶ 3, *N. Am. Butterfly Ass'n v. Nielsen*, 17-cv-2651 (ECF 19) (D.D.C. Mar. 28, 2018).

[5] *See N. Am. Butterfly Ass'n v. Nielsen*, 368 F. Supp. 3d 1, 8 (D.D.C. 2019).

[6] Brief for Defendants/Appellees, *N. Am. Butterfly Ass'n v. McAleenan*, No. 19-5052, 2019 WL 3996272, *51 (D.C. Cir. Aug. 23, 2019) (quotations omitted).

[7] *N. Am. Butterfly*, 977 F.3d at 1265-66.

[8] *Id*. (quoting *Propert v. D.C.*, 948 F.2d 1327, 1331 (D.C. Cir. 1991)).

notice to or consent from the Association."[9]   Second, as Defendants argued, the plaintiff there could have sued under the Tucker Act or Federal Tort Claims Act after the fact—but the D.C. Circuit held that it was not required to do so.[10]

In short, in a case directly on point and decided only two months ago, the D.C. Circuit reached a result that is flatly inconsistent with both of Defendants' due process defenses here.

## 1.    Underlying Principles

The D.C. Circuit's conclusion should not be surprising.  It is consistent with Supreme Court precedent and simple common sense.  No one doubts that, where possible, it is better for due process to come before the government takes action against a citizen—better indeed for the government as well as the citizen.  And no one doubts that process before the deprivation is sometimes impracticable.  Most acts of negligence[11] and many emergency actions[12] cannot be the subject of a prior hearing or negotiation because they are not intentional or predictable. Nonetheless, as the Supreme Court has made clear in cases like *Hudson v. Palmer,* if pre-

---

[9] *Id*. at 1266.  They further "installed sensors at the Center to detect aboveground activity, widened private roadways within the property, cut down trees, and threatened to destroy the Association's private gates and locks without warning." *Id*.

[10] *Id*. at 1265-55.

[11] *See Daniels v. Williams*, 474 U.S. 327, 328 (1986) (rejecting prisoner's claim that deputy deprived him of his property interest in freedom from bodily injury by negligently leaving a pillow on the stairs, creating a fall hazard). Defendants' conduct here was not "negligent" in any meaningful sense of the word.  After the first blast adjacent to Plaintiffs' land (if not long before it), Defendants realized that their actions would lead to intrusions and rockfall. Rather than pausing and seeking an easement to continue, Defendants continued and intensified their efforts.  *See* Declaration of Sage Goodwin ¶¶ 43-53, ECF 4-3 (Nov. 29, 2020) ("Goodwin Decl.").  Defendants' Opposition only confirms this fact.  Even Colonel Gant describes a process that included approving blast plans in June 2020 and considering and rejecting the use of blast mats.  *See* Second Declaration of Colonel Antoinette R. Gant ¶¶ 11, 27 ECF 20-02 (Dec. 14, 2020) ("Second Gant Decl.").  Defendants considered using debris netting before blasting, but decided not to because the netting "would likely have been destroyed by the blasts." *Id*. ¶ 28(b).  They knew what was about to happen, considered the risks, and proceeded regardless.

[12] For example, the Government need not provide pre-deprivation process where it would have to "wait until dangerous or criminal items have been introduced into [a] prison."  *Scott v. Conley*, 937 F. Supp. 2d 60, 76 (D.D.C. 2013).

deprivation process is practicable, it is preferred:  the "controlling inquiry is solely whether the state is in a position to provide for predeprivation process."[13]

Indeed, the history of this case shows the wisdom of pre-deprivation process.  In their most recent filing, Defendants informed the Court that upon reviewing relevant hydrologic studies, they became "aware of the potential for flooding in close proximity to planned Crossing 2125."[14] Defendants do not state when they became aware of this potential, but it is not unreasonable to think that this litigation played a role.  As a result of Defendants' reconsideration of the flooding risk, the "[c]ontractor has been directed to further review the design alternatives,"[15] potentially saving both government and citizen from the consequences of a serious blunder.  This is precisely why due process should precede adverse action when practicable; it is the only way to take into account the landowners' concerns when it is still possible to avoid irreparable damage.

### 2.    Congress has Required Defendants to Provide Pre-Deprivation Process.

The simple fairness of a prior hearing has been as plain to Congress as to the courts.  The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which the President has used to authorize and waive most procedural obstacles to border wall construction, did not waive due process for landowners.  In fact, the IIRIRA provides a limited menu of options for Defendants in dealing with landowners.

---

[13] 468 U.S. 517, 534 (1984).  There may also be occasional cases where the harm is so trivial or so clearly about money that it is fair to simply adjudicate the compensation due after the fact.  *See Andree v. Ashland County*, 818 F.2d 1306, 1314-15 (7th Cir. 1987) (rejecting due process claim based on deputies' refusal to pay admission fee to attend outdoor concert); *Wise v. Bravo*, 666 F.2d 1328, 1335 (10th Cir. 1981) (rejecting father's argument that officers entered his apartment without consent or process of law to resolve a child custody dispute).

[14] Second Gant Decl. ¶ 30.

[15] *Id.*

The IIRIRA's land acquisition authority is set out in 8 U.S.C. § 1103(b).  This provision allows the Government to purchase interests in land, to accept them as a gift, or—if the owner does not agree to a reasonable price—to condemn them.  What the statute does not authorize the government to do is simply to take what it wants and tell the landowner to find some post-deprivation remedy.

The fact that Congress specified these methods—and only these methods—to interfere with landowners' rights means, as courts have recognized, that "the Attorney General must proceed pursuant to the authority granted by section 103(b) of IIRIRA . . . to purchase and/or take the necessary easements and land through condemnation actions."[16]

Section 1103 does not leave the government without a remedy in dealing with recalcitrant owners.[17]  But it does put on the government the onus of initiating any litigation, and only after first seeking an amicable resolution through consultation and negotiation.  As the Justice Department's own Manual declares about such disputes:

> There should be a thorough exploration of settlement possibilities within 90 days. Use your settlement authority to the fullest extent possible. Outside of direct purchase, which the acquiring agencies have been urged to accomplish whenever possible, amicable settlement represents the quickest and most satisfactory way for a government to acquire privately owned property.[18]

---

[16] *United States v. 1.04 Acres of Land, More or Less, Situate in Cameron Cty., Tex.*, 538 F. Supp. 2d 995, 997 (S.D. Tex. 2008) ("*1.04 Acres*").

[17] The condemnation provision, 8 U.S.C. § 1103(b)(3), refers to 40 U.S.C. § 3113, which provides:

> An officer of the Federal Government authorized to acquire real estate for the erection of a public building or for other public uses may acquire the real estate for the Government by condemnation, *under judicial process*, when the officer believes that it is necessary or advantageous to the Government to do so.

40 U.S.C. § 3113 (emphasis added). This judicial process is defined by 40 U.S.C. § 3113 and Rule 71.1 of the Federal Rules of Civil Procedure.

[18] United States Department of Justice, Justice Manual, ENRD Resource Manual, 9-Point Program for Settlement or Dismissal Within One Year (2018).

Negotiating with landowners before infringing their rights is not just prudent advice; it is an obligation. Courts have ruled that 8 U.S.C. § 1103(b) imposes a statutory obligation on the Government to negotiate before obtaining possession in border wall cases.[19]

In fact, Defendants have recognized that obligation in their representations to Congress. When the U.S. Government Accountability Office ("GAO") reported to Congress on the border wall land acquisition process,[20] it obtained written descriptions of the process from CBP's Border Wall System Program Office—the same office where Mr. Enriquez is the Acquisitions, Real Estate and Environmental Director.[21] GAO's report represents that the process is as follows: First, USACE identifies landowners "affected by" the proposed border barrier.[22] Defendants then negotiate with landowners for rights of entry for surveying, with recourse to the takings process if negotiations break down.[23] After surveying is complete, Defendants undertake yet another process, including more negotiations, to acquire the necessary rights for construction.[24]

By and large, that has been a fair representation of Defendants' practice in building the wall. In Texas, where there is no Roosevelt Reservation, the government has generally sought rights of entry rather than simply taking the access it wants.[25]

---

[19] *See 1.04 Acres*, 538 F. Supp. 2d at 1010 ("This Court finds that Congress clearly intended there to be some level of negotiation between the Government and the owner of a property interest prior to the institution of eminent domain procedures pursuant to 8 U.S.C. § 1103(b)(3)."); *United States v. 23.311 Acres of Land*, No. 7:19-CV-00407, 2020 WL 4724332, at *3 (S.D. Tex. Mar. 4, 2020) (same).

[20] Southwest Border: Information on Federal Agencies' Process for Acquiring Private Land for Barriers at Cover, 5, Government Accountability Office, GAO-21-114 (Nov. 17, 2020) ("GAO Report"), https://www.gao.gov/assets/720/710707.pdf.

[21] GAO Report at 3; Declaration of Paul Enriquez, ¶ 1, ECF 20-01 (Dec. 14, 2020) ("Enriquez Decl.").

[22] GAO Report at 21.

[23] *Id*. at 22.

[24] *Id.* at 25

[25] *See, e.g.*, *United States v. 5.65 Acres of Land in Starr County, Texas*, 7:08-cv-00202, 2020 WL 5105206 (S.D. Tex. Aug. 31, 2020).

Even in this case, Defendants belatedly conformed to this procedure, announcing that they will seek a Temporary Construction Easement for activities with a likely impact on Ranch property.[26] Plaintiffs have grave concerns about Defendants' handling of this new and serious risk, but they appreciate Defendants' recognition that negotiation of an easement is required before the bulldozers move in.

In short, Defendants' due process obligation to provide notice, to negotiate, and to undertake the burden of initiating litigation before intruding on Plaintiffs' property is consistent with Congress's expectations, with precedent in the Supreme Court and this Circuit, and with their own longstanding practice.

## B.    Defendant's Latest Disclosures Suggest a Deep-Seated Lack of Respect for Plaintiffs' Rights.

The Opposition includes one disclosure that, if Plaintiffs understand it correctly, demonstrates Defendants' lack of respect for the Ranch's property and due process rights. Colonel Gant discloses "pockets of incompetent rock and soil" that "could compromise Plaintiffs' property absent mitigation."[27] Mr. Goodwin did not understand what this point referred to, so he visited the Ranch's land adjacent to the border wall with a photographer to see for himself.[28] The resulting

---

[26] Second Gant Decl. ¶ 27(c).

[27] Second Gant Decl. ¶ 19.

[28] Second Declaration of Sage Goodwin ¶ 4 ("Second Goodwin Decl."). Plaintiffs recognize that the submission of evidence on reply is disfavored. They respectfully request that the Court exercise its discretion to consider the submission here, given that Defendants failed to mention this issue until the Second Gant Declaration. As one court has recognized:

> It seems absurd to say that reply briefs are allowed but that a party is proscribed from backing up its arguments in reply with the necessary evidentiary material. Such a rule would allow the party opposing the motion to *gain an unfair advantage by submitting issues and evidentiary support that were unforeseen at the time the motion was first proffered*.

*Baugh v. City of Milwaukee*, 823 F. Supp. 1452, 1456-57 (E.D. Wis. 1993) (emphasis added), *aff'd*, 41 F.3d 1510 (7th Cir. 1994). In light of this situation, Plaintiffs have no objection to Defendants' filing a surreply, appropriately limited to facts described in the Second Goodwin Declaration and their implications for the case.

photograph shows a very deep trench in Shadow Mountain with sides that are almost perpendicular to the ground.[29]   It would be misleading to describe this as a "blasting catch;" it is far deeper than necessary to prevent debris from falling down the slope onto the Ranch, and it did not exist when the most intrusive blasting was under way in October.[30]

Neither Mr. Goodwin nor his attorneys are engineers, but Defendants' warning about "pockets of incompetent rock and soil" that "could compromise" Ranch property seems to indicate that the northern wall of Defendants' trench could collapse, in whole or in part, into the trench itself, taking the Ranch's property with it.[31]   If so, this is the first Plaintiffs have heard of such a risk.

According to Colonel Gant, Defendants' contractor first noticed this issue on November 19, 2020.[32]   Yet neither SWVC nor Defendants notified Plaintiffs of the issue until almost a month later, well after Plaintiffs filed this case.[33]   Defendants did not include this information in their briefing on December 1,[34] even as they promised to adopt "best management practices including berms and pits that should prevent impacts to Plaintiffs' properties" and dismissed the idea that there was any exigency requiring immediate relief.[35]   Nor was it mentioned in their filing of

---

[29] *See* Second Goodwin Decl., Ex. A.

[30] Second Gant Decl. ¶ 16 n.4.  Colonel Gant described a "wall of rock and sand, approximately 40-50 feet in height on its north face, made from drilling, dozing and blasting adjacent to the Plaintiffs' property."  *Id.*  No such "wall" appears in the videos of the October blasting or November aftermath. *See* Declaration of John Kurc ¶¶ 6-10, ECF 4-8 (Nov. 25, 2020) ("Kurc Decl.").  Plaintiffs do not believe such a wall was ever employed.

[31] Second Goodwin Decl. ¶¶ 7-8.

[32] Second Gant Decl. ¶ 19.

[33] Plaintiffs do not suggest that Colonel Gant hid the problem, but the fact remains that Defendants and their contractor have been aware of this issue for weeks.  Defendants are responsible for their contractor's actions.

[34] Motion for a Briefing Schedule on Plaintiffs' Motion for a Temporary Restraining Order, ECF 9 (Dec. 1, 2020).

[35] *Id*. at 2.

December 2,  which included sweeping representations that no irreparable injury was likely and a pointed reprimand:

> The government's representations, based [on] discussions with the federal agency defendants, belie any immediate irreparable harm.  The government has represented that blasting has ceased and culvert work is not imminent, and Plaintiffs are in no position to diminish or question those representations.[36]

Nor was this risk mentioned during the December 7 hearing.[37]  Even the filing that disclosed the problem does not come out and say that Defendants' ongoing construction has created a new danger—not rocks falling from the Roosevelt Reservation onto the Ranch, but rather parts of the Ranch's property collapsing onto the Reservation.  Instead, Defendants declare that they are taking "additional mitigation measures . . . to . . . further protect Plaintiffs' property from rock fall."[38]

Plaintiffs recognize that there is considerable ambiguity in Defendants' description of the issue, and even more uncertainty about when the information available to Col. Gant on November 19 was conveyed to Defendants' counsel.  But Defendants have shown such a consistent mixture of soothing talk and reckless disregard of Ranch property that Plaintiffs suspect that this is of a piece with Defendants' to keep building wall no matter what the cost to Plaintiffs.  Defendants plainly believe, as they have advocated here, that Plaintiffs have no right to pre-deprivation due process.  They seem to have concluded that they can do whatever it takes to expedite wall construction without warning the Ranch of any harm, and that the worst that will happen is that the Ranch will be forced to sue for a paltry sum after the fact.  This is not the law, and the Court need not condone this conduct.

---

[36] Reply in Support of Defendants' Motion for Briefing Schedule on Plaintiffs' Motion for a Temporary Restraining Order, ECF 12 (Dec. 2, 2020).

[37] December 7, 2020 Transcript of Motion Hearing.

[38] Second Gant Decl. ¶¶ 28(a)-(c).

## C.      Defendants' Treatment of the Ranch was Unconscionable.

Plaintiffs' concerns were neither taken seriously nor addressed meaningfully until this action was filed.  Defendants' actions between March and October 2020 were of a piece—and the opposite of "good faith" engagement and consultation.[39]

From the beginning, Defendants' engagement with landowners like the Ranch has consisted of empty assurances combined with a refusal to stop construction to assess the damage it might do.  On May 15, after being invited to submit comments to CBP, Plaintiffs expressed their concerns of construction going beyond the Roosevelt Reservation and potential flooding of Guadalupe Canyon.[40]   On June 30, CBP's outreach team, presumably under Mr. Enriquez's direction,[41] responded with a form email, which failed to address Plaintiffs' concerns about collateral damage from blasting.[42]   Nothing was done to address them, but construction and the accompanying intrusions onto Plaintiffs land nonetheless began in early July.

On August 19, Senators Heinrich and Udall sent a letter to the heads of CBP and the Department of Defense reiterating Plaintiffs' concerns.[43]   It had no real effect.  On September 10, Mr. Enriquez met with Plaintiffs and "noted that the rockfall on Plaintiffs property was unacceptable."[44]  Despite Mr. Enriquez's assurances and senior position within CBP, nothing was done to turn his words into action.  Quite the contrary, in early October, SWVC conducted blasting on Apache Lookout, sending tons of debris tumbling down onto Plaintiffs' property.[45]

---

[39] Enriquez Decl. ¶ 16.

[40] Goodwin Decl., Ex. F.

[41] Mr. Enriquez is "responsible for overseeing . . . stakeholder outreach[.]"  Enriquez Decl. ¶ 14.

[42] Goodwin Decl., Ex. H.

[43] Goodwin Decl., Ex. M.

[44] Enriquez Decl. ¶ 18.

[45] Goodwin Decl. ¶ 44.

On October 14, in response to additional correspondence from Plaintiffs, Mr. Enriquez assured Plaintiffs that "the construction contractor has developed plans to catch debris and contain rocks to the pioneered sections of the Roosevelt Reservation."[46]  There is no sign that the effective trench and berm described in that letter was in place while most of the blasting was under way. The slight berm seen in the October 22 video was clearly insufficient.[47]  To justify the massive intrusion of such blasts, Mr. Enriquez now says that he is not a blasting expert.[48]  But he did receive and could have read the blasting reports that showed day after day of blasting; he could easily have seen, even before October 22, the debris littering Ranch property downslope from the construction and demanded a change in procedures he had declared "unacceptable."[49]  Even if he wasn't in charge of blasting, he surely knew how to order the contractor who was in charge to avoid downslope intrusions.  He did none of that.  If he did not intend the rockfalls that resulted, he was clearly indifferent to them.[50]

He was also aware that Plaintiffs were seeking and expecting the negotiated right of entry process that Congress and past CBP practice required.  Representatives of the Ranch began asking in the spring of 2020 for the Defendants to negotiate rights of entry for the actions likely to affect Plaintiffs' rights.[51]  That process, with its incentives for detailed and good faith negotiation, would likely have prevented much of the harm Plaintiffs have suffered.  But Defendants chose to ignore

---

[46] Goodwin Decl., Ex. S.

[47] Goodwin Decl. ¶ 50.

[48] Enriquez Decl. ¶ 19.

[49] *Id*. ¶ 20.

[50] Plaintiffs are not alone in their view that Defendants had no interest other than building as much wall as possible as fast as possible and that their "engagement" with landowners was simply theater.  Other groups have described CBP's public comment process as "a completely meaningless exercise," adding that the government's "prior actions clearly demonstrate that the agency has no intention of factoring public input into project planning or design."  Goodwin Decl., Ex. CC.

[51] Goodwin Decl. ¶¶ 10-16.

that process, a decision that must have been made quite deliberately, given Mr. Goodwin's frequent inquiries about why no ROE had yet been proposed. The reason is not hard to divine. Building the border wall had become a signature initiative for the current administration, and no delay was tolerated in Washington. There is nothing speculative about this connection, which has been made repeatedly by numerous independent observers.[52]

Substantive due process exists, in part, to "protect[] citizens against government abuse."[53] Contrary to Defendants' suggestion, it is not limited to forced stomach pumping. It may be invoked whenever government engages in "a deliberate flouting of the law that trammels significant personal or property rights."[54] That is what Defendants have been doing all year, and only an injunction will stop them.

## II.   PLAINTIFFS WILL BE IRREPARABLY HARMED IN THE ABSENCE OF INJUNCTIVE RELIEF

### A.   Defendants' Intrusions Justify Injunctive Relief.

Defendants urge this Court to measure irreparable injury by cutting Defendants' violations of due process into several slices and treating each in isolation.[55] This approach has two flaws. First, it demands that *Plaintiffs* identify all of the ways in which Defendants' plans and fast-moving

---

[52] *See, e.g.*, Anita Snow, *Damage from border wall: blown-up mountains, toppled cactus*, Associated Press, Dec. 18, 2020, https://www.sfgate.com/news/article/Damage-from-border-wall-blown-up-mountains-15810719.php (quoting estimate that the cost of terminating border contracts "would pale in comparison to the price of finishing and maintaining the wall"); John Burnett, *Contractors Dynamite Mountains, Bulldoze Desert In Race to Build Trump's Border Wall*, NPR, Dec. 11, 2020, https://www.npr.org/2020/12/11/945194147/contractors-dynamite-mountains-bulldoze-desert-in-race-to-build-trumps-border-wa; Simon Romero & Zolan Kanno-Youngs, *A Rush to Expand the Border Wall that Many Fear is Here to Stay*, N.Y. Times, Nov. 29, 2020, https://www.nytimes.com/2020/11/28/us/trump-biden-border-wall.html ("N.Y. Times"); Nick Miroff, *Trump administration in all-out push to build border wall before election*, Wa. Post, Sept. 29, 2020, https://www.washingtonpost.com/immigration/trump-border-wall-push/2020/09/29/689bc740-f8f5-11ea-a510-f57d8ce76e11_story.html.

[53] *Pitchford v. City of Earle*, No. 3:06CV00140 WRW, 2007 WL 3256851, *2 (E.D. Ark. Nov. 2, 2007), *aff'd sub nom. Pitchford v. City of Earle, Ark.*, 320 F. App'x 477 (8th Cir. 2009).

[54] *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988).

[55] *See* Opposition at 15.

construction practices in a remote location may harm Plaintiffs' property.  But as we have seen, Defendants often are in a much better position to identify the injuries their activities will cause, so adopting the Defendants' piecemeal injury analysis encourages them to move fast and disregard the consequences.  Second, Defendants' refusal to adhere to due process was not a series of blunders; it was a single course of action, almost certainly motivated by a belated discovery that construction near the Ranch was likely to intrude on Plaintiffs' rights, and that the due process that could have been provided without difficulty months earlier could now cause delays that would not be welcome in Washington.  Faced with those facts, Defendants simply bulled ahead, letting the consequences fall on Plaintiffs; they set off explosives, dropped rocks, and rushed forward a culvert design that even Defendants now reject as insufficient to prevent flooding.[56]  Those are all irreparable injuries, and Defendants' belated disclosure of the risks posed by the cliff they have dug next to Ranch property raises the question how many more injuries will be disclosed when it is too late to prevent them.[57]

## B.    Defendants' Plans Pose Significant Risks

Although the Defendants' Opposition attempts to be reassuring, a close read reveals that Plaintiffs still have cause for concern.  First, as discussed above, Defendants' latest construction activities pose imminent risks to the Ranch.[58]  Plaintiffs were not aware of these risks when they filed this lawsuit because Defendants did not disclose them.  The recent revelation that the Ranch's

---

[56] *See Id.* at 5.

[57] Defendants add insult to injury when they dismiss the rockfalls they cause as simply adding a few rocks to a remote corner of the world where rocks are already a "natural part of the landscape."  Opposition at 5.  The managers of the Ranch chose their home precisely because it is remote and wild, a character Defendants have diminished permanently.  As for the claim that the rocks are part of the natural landscape, we suggest that the Court revisit the video of the October 22 blast and compare the untouched landscape above the construction to the pile of rocks below it.  The effects of Defendants' unconstitutional acts will be evident for generations.

[58] Second Goodwin Decl. ¶¶ 7, 10.

property may collapse, absent "mitigation" that Defendants do not describe in any detail, demonstrates how Defendants' headlong rush continues to pose an impending risk to the Ranch.

Their failure to disclose and address the issue until forced to do so suggests that the various "plans" Colonel Gant proposes will quickly evaporate as the threat of litigation recedes.[59]  Second, Defendants do not address the video evidence that their bulldozing can push tons of rock onto Plaintiffs' property even absent the use of explosives.[60]  Finally, Defendants have recognized that they need access to thirty feet of Plaintiffs' land to "adjust the slope of the Mountain respective to the Plaintiffs' property and prevent further rock fall."[61]  While Plaintiffs' welcome Defendants' belated recognition that they must follow the procedures laid out by Congress, their request for such a wide zone suggests that they expect more than "some small amount of incidental, additional rockfall."[62]

For all these reasons, the most appropriate relief for Defendants' incorrigible conduct is to halt further construction adjacent to the Ranch until Defendants present and implement a plan to identify any likely harms to Ranch property and to negotiate an easement for those harms.

In addition, specific measures should be ordered to address particular abuses:

- Defendants should be required to give Plaintiffs notice of any construction activities that threaten to compromise the Ranch's property, rather than disclosing them only after they are complete.  In particular, before undertaking further operations in the Shadow Mountain cut, they should explain clearly the nature of the risks they have created and how they propose to mitigate those harms.

- Similarly, before undertaking actions realistically likely to cause further rockfall, including the collapse of Ranch property into the Roosevelt Reservation, Defendants should obtain an easement—as they propose to do

---

[59] *Id*. ¶ 28.

[60] *See* Kurc Decl. ¶ 9.

[61] Second Gant Decl. ¶ 28(c).

[62] Opposition at 16.

with respect to their vague plan to "adjust the slope" along Plaintiff's property line. The negotiation of any easement should include sharing of enough information about the planned activity and a proposal for remediation sufficient to ensure that the consultation is meaningful.

- The same easement procedure should be required before any obstruction of Guadalupe Canyon Creek that is realistically likely to cause flooding of Plaintiffs' property and particularly its road.

- Finally, Defendants should not have the option, as they do now, to conduct blasting adjacent to the Ranch's property upon ten days' notice. They should do none unless they obtain an easement for any damage they may cause.

Plaintiffs have attached a proposed order hereto spelling out their requested preliminary injunction.

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FACTORS FAVOR PLAINTIFFS

In their original memorandum on how to weigh the public interest in this case, Plaintiffs stressed the many cases from this jurisdiction holding that "government actions in contravention of the Constitution are always contrary to the public interest."[63]  Just as Defendants did not contest the law holding that constitutional violations are irreparable injuries, so too they do not contest that there is an overriding public interest in obeying the Constitution.

That ought to be the end of the matter, particularly because Defendants' public interest discussion reads as though it has been cut and pasted from some very different case.  The Ranch, after all, is not trying to stop construction of a border wall across all of the Southwest.  It is arguing about the way the wall is being built on 1.5 miles of the most rugged country on the border—country that hasn't needed a wall to deter illegal entries for the last 175 years.

---

[63] Motion at 18 (collecting cases).

Defendants' claim that the wall is immediately necessary to stop a wave of illegal entries is utterly unsupported.  Defendants misleadingly cite illegal crossing figures from the entire Tucson sector, which is 262 miles long and includes both flat desert and occasional urban areas. These areas are where the overwhelming majority of illegal entries in Tucson sector have occurred, especially during recent surges, when illegal entrants simply walked across the border in broad daylight to turn themselves in and claim asylum.

The stretch of border at stake in this case, in contrast, is in Cochise County, Arizona, and rather than talk about the number of entries in this area—numbers they almost certainly have—Defendants make much of the County's designation as a High Intensity Drug Trafficking Area ("HIDTA") by the Office of National Drug Control Policy.  This would be more impressive had that office not designated every single county on the US-Mexico border as such an area, apparently in a blanket designation of the entire border.[64]

In contrast to Defendants' careful silence on local statistics, press reports tell us what common sense suggests:  that illegal border crossings have historically been "extraordinarily infrequent" in the part of the border adjacent to the Ranch,[65] probably as low as "a few dozen a year," according to Mr. Goodwin's informed estimate.[66]  And Defendants cannot deny that, as recently as April of this year, they were telling local residents that they had not decided whether

---

[64] *See* U.S. Drug Enforcement Administration, DEA Programs: High Intensity Drug Trafficking Areas (HIDTAs), https://www.dea.gov/hidta#:~:text=The%20High%20Intensity%20Drug%20Trafficking%20Areas%20%28HIDTA%29%20program%2C,the%20Office%20of%20National%20Drug%20Control%20Policy%20%28ONDCP%29.    It would also be more meaningful if HIDTA counties did not cover much of the U.S. and over 65% of its population.

[65] "Until the blasting crews showed up this year, the canyon was so remote — about 30 miles outside of Douglas, the closest town, on largely dirt roads — that ranchers in the area say illegal crossings by migrants were extraordinarily infrequent."  N.Y. Times.

[66] "We know that electronic monitoring, horse and foot patrolling, and manned and unmanned aircraft surveillance of this entire area has reduced illegal immigration to a few dozen intrusions a year."  Goodwin Decl., Ex. P.

to build this section of wall, acknowledging its extraordinarily high cost.  It trivializes national security to dress this marginal project up as critical to national security.

As for the balance of harms, once the security claims are put in perspective, the harm Defendants claim is at best financial.  It is "well established in this Circuit that monetary loss is usually accorded little or no weight in the irreparable-harm analysis."[67]  And Defendants cannot say with certainty that they will suffer any losses that will not be suffered in any event if work is stopped by a new administration in a month.

## CONCLUSION

Defendants' Opposition ignores the key cases on point, misstates the true risk of irreparable harm, and fails to meaningfully engage with Plaintiffs' arguments on the balance of hardships. The Court should require Defendants to identify risks to the Ranch, discuss them with its owners, and plan mitigation attempts *before* it does any further damage to the land.  Plaintiffs respectfully request that the Court grant a preliminary injunction.

Dated:  December 21, 2020      Respectfully Submitted,

                         /s/ *Stewart A. Baker*
                         Stewart A. Baker (D.C. Bar No. 262071)
                         Lia Metreveli (application submitted)
                         STEPTOE & JOHNSON LLP
                         1330 Connecticut Avenue, NW
                         Washington, DC 20036
                         Tel: (202) 429-3000
                         Email: sbaker@steptoe.com
                         Email: lmetreveli@steptoe.com

                         David Hirsch
                         STEPTOE & JOHNSON LLP
                         1114 6th Avenue
                         New York, NY 10036
                         Tel: (212) 506-3900
                         Email: dhirsch@steptoe.com

---

[67] *Pharm. Research & Mfrs. of Am. v. United States*, 135 F. Supp. 2d 1, 18 (D.D.C. 2001).

## **CERTIFICATE OF SERVICE**

This is to certify that on the 21st of December 2020, the foregoing was electronically filed with the Clerk of Court using the Court's CM/ECF system.

_/s/ Stewart A. Baker_
Stewart A. Baker