**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **DIAMOND A RANCH**, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 20-cv-3478 (CRC) |
| **KRISTI NOEM**[1], in her official capacity as Secretary of the U.S. Department of Homeland Security, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Good fences surely make good neighbors.  But what happens when the unwelcome construction of a fence by the federal government causes collateral damage to a neighbor's land?  Has the government violated the neighbor's due process rights?

Plaintiffs Diamond A Ranch, Western Division, L.L.C., and the Guadalupe Ranch Corporation (collectively "the Ranch") own land in Arizona next to a strip of federal property along the U.S.-Mexico border.  The Ranch claims that the government's construction of the border wall on that property visited various harms on its land—chiefly debris falls from blasting activity, an increased risk of flooding, and occasional physical trespasses by workers.  These transgressions, the Ranch says, deprived it of property in violation of the Fifth Amendment's procedural and substantive due process protections.  But while the government's alleged conduct was far from neighborly, and might warrant relief through other means, the Ranch's allegations—in both the present complaint and a proposed amended one—fall short of stating a

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current Secretary of the Department of Homeland Security is automatically substituted as a party in this action.

due process violation.  The Court will therefore grant the government's motion to dismiss the case.

## I.    Background

The Court draws the following background from the Ranch's First Amended Complaint ("FAC") except where otherwise noted.

The Ranch owns property near the United States' border with Mexico in Cochise County, Arizona.  FAC ¶¶ 14, 45.  That property abuts the Roosevelt Reservation, a sixty-foot strip of federal land along the border running from California to New Mexico.  Id. ¶ 47.  President Theodore Roosevelt first set aside the Reservation "as a protection against the smuggling of goods between the United States and Mexico."  Id.  Today, the Reservation makes it "relatively easy for the federal government to build infrastructure to prevent illegal border crossings."  Id.  The complaint describes the region of the Reservation neighboring the Ranch as "rugged, remote, and incredibly steep mountainous terrain."  Id. ¶ 48.  This foreboding landscape "traditionally deterred illegal immigrants from crossing the border into the region," and the Ranch frequently cooperated with government officials and "negotiated rights of entry" for officials "to facilitate border security improvement."  Id.

On January 25, 2017, President Trump issued Executive Order 13767, entitled "Border Security and Immigration Enforcement Improvements," ordering the construction of a border wall.  Id. ¶ 53 (citing Exec. Order No. 13767, 82 Fed. Reg. 18 (Jan. 30, 2017)).  Soon thereafter, then-DHS Secretary John Kelly directed Customs and Border Protection ("CBP") to begin work on the wall.  Id. ¶ 54.  And on February 15, 2019, the President declared an emergency at the southern border, which expanded the role of the Department of Defense in building the wall.  Id. ¶ 55.

Pre-construction activities near the Ranch began about a year later.  The Ranch alleges that on February 18, 2020, "a border wall team" comprised of personnel from CBP, the U.S. Army Corps of Engineers ("USACE"), and a private contractor entered its property without prior notice or legal authorization.  Id. ¶ 59.  When the Ranch complained, a CBP official purportedly assured it that the government did not plan to build near its land because the area was too rugged for construction.  Id. ¶ 60.  The contractors, meanwhile, indicated that any blasting required for potential construction would be minimal.  Id.  The Ranch insists that these assurances were illusory and that the agencies involved engaged in no meaningful consultation with the Ranch about how to minimize impact on the area prior to beginning construction.  Id.

Construction began in early July 2020.  According to the complaint, the construction involved "level[ing] the steep terrain" by "blast[ing] large portions of the hillsides into the valleys below."  Id. ¶ 65.  Because contractors "neglected to use" necessary precautions like "blast mats, shields, or walls," they "blasted demolition dust, shrapnel, and car-sized boulders off the Roosevelt Reservation onto Ranch Property."  Id. ¶ 66.  Contractors also drove heavy equipment on its property, the Ranch claims.  Id. ¶¶ 61–62.  Although not stated in the complaint, the Ranch acknowledges the contractors drove on the land at this time to remove debris from the blasts.  See Tr. of Mot. Hearing, Sep. 2025 ("Sep. 2025. Tr."), ECF No. 84, at 40:24–41:7.

The Ranch highlights work done on "Shadow Mountain," an "extremely steep" rock feature that is positioned such that "any debris displaced from Roosevelt Reservation would predictably roll far down the hill onto the Ranch property."  FAC ¶ 98.  According to the Ranch, the government offered assurances that contractors would prevent debris falls from this work and other efforts, but some of the most destructive activity came after those promises.  Id. ¶¶ 99–103.

The debris blasts reportedly caused and will continue to cause adverse environmental consequences for the Ranch and the surrounding waterways and land.  See, e.g., id. ¶¶ 69, 73.

The Ranch also emphasizes construction work in the bed of Guadalupe Creek, a seasonal creek which flows south through the Guadalupe Canyon into Mexico and traverses the Ranch's property.  Id. ¶ 72.  The Ranch describes attempts to work with the construction team to find a "workable solution" for reducing the risks of flooding due to the placement of barriers in the creek bed.  Id. ¶ 74.  The Ranch alleges that the government initially refused to share a study it had completed on the issue and that when the Ranch finally did see the study, it was too "meager" for the government to make "informed" decisions about construction in the creek bed. Id.  The Ranch claims that it offered the government more detailed records concerning rainfall in the canyon watershed to supplement its own research, but the assistance was refused.  Id. ¶ 75. According to the Ranch, the government began erecting obstructions in the creek bed despite assurances that it would not do so.  Id. ¶¶ 77, 80.

The Ranch further contends that the government dealt with its representatives in bad faith.  Id. ¶ 92.  Despite going through the motions of consultation, the Ranch says, the agencies involved did not stop entering its land or seek to negotiate a right of entry; did not ensure that contractors stayed within the boundaries of the Roosevelt Reservation; did not follow through on various assurances made to the Ranch about how the construction would proceed, including commitments to stop debris falls; did not provide studies or reports on the impact of the project; and did nothing to fix damage created by the construction despite promises to do so.  Id. ¶¶ 92–103.

The Ranch filed this suit in November 2020.  It named as defendants the Secretary of Homeland Security and officials of CBP, the U.S. Border Control, and USACE acting in their

official capacities, as well as USACE itself.  The complaint advanced three claims for relief: the

first for a violation of the Ranch's procedural due process rights, the second for a violation of its

substantive due process rights, and the third, against USACE only, for a violation of the Freedom

of Information Act.  The Ranch has since voluntarily dismissed its FOIA claim.  See ECF No.

75.  In addition to requesting injunctive relief, the complaint sought a temporary restraining order

and preliminary injunction to halt then-ongoing construction near the Ranch's property.

The Court held a hearing on the Ranch's request for emergency relief on December 7,

2020.  See Tr. of Mot. Hearing, Dec. 2020 ("Dec. 2020 Tr."), ECF No. 19.  At the hearing, the

government represented that it would provide advance notice of any future work in the creek

bed.  Id. at 15:21–16:8.  (The government had already assured the Ranch it would not begin any

work in the creek bed until January 15, 2021.  FAC ¶ 81.)  The Ranch insists, however, that the

government did not take necessary steps to cause its contractors to cease work following the

government's representations.  Id. ¶ 82.  The Ranch alleges that the work—which purportedly

began prior to the hearing and continued afterwards—destabilized the creek bed and eventually

led to damage to the sole access road from the Ranch to the nearest hospital.  Id. ¶¶ 82–86.

Specifically, the Ranch reports that construction sediment in the creek caused the "creek to scour

a deep hole in the access road," causing a truck to sink into a hole deep enough to require

workers to "climb onto the truck's roof as it began to take on water and submerge."  Id.[2]  The

Ranch fears further damage absent removal of the creek bed construction, particularly the

possibility of floods.  Id. ¶¶ 87–88.

---

[2] The Court understands this road to be a public one, based on the Ranch's pleadings.
See e.g., Pls.' Opp'n, at 5 (describing it as "the sole access road on which the Ranch depends,"
rather than as a private road on Ranch property); cf. FAC ¶ 88 (discussing the Ranch's "private
road").

Circumstances changed in January 2021, after former President Biden took office and promptly terminated construction on the border wall.  See "Proclamation on the Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction," Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021).  The parties agreed to a 60-day stay in proceedings, which was repeatedly extended to allow for continued negotiations over remediation by the government.  See ECFs 38–66.  In February 2024, the parties reported that they "had just about hammered out all the details and reached [a settlement] . . . that would resolve this case without further judicial intervention." ECF 62.  But the settlement fell apart.  In March 2024, Judge Drew B. Tipton of the Southern District of Texas issued a universal injunction preventing DHS from obligating previously appropriated border-wall funds "toward mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes."  Gen. Land Off. v. Biden, 722 F. Supp. 3d 710, 745 (S.D. Tex. 2024).  DHS was thus prevented from funding the restoration activities called for in the draft settlement.

At the parties' request, the Court lifted the stay in August 2024.  See ECF 66.  The Ranch promptly filed the operative FAC in September 2024. The FAC's factual assertions largely mirror those in the initial complaint and pertain to events that took place prior to November 2020 when the original complaint was filed, with two exceptions.  First, the FAC outlines the previously described events during and following the December 7, 2020, hearing.  FAC ¶¶ 79–83.  Second, it elaborates on some of the consequences of the work in the creek bed that it claims have already occurred and might occur in the future.  Id. ¶¶ 84–88.

On November 1, 2024, the government moved to dismiss the FAC for failure to state a claim under Federal Rule of Procedure 12(b)(6).  After the motion to dismiss became ripe, the

Ranch moved for leave to file a second amended complaint ("SAC"), which the government opposes as futile.  The proposed SAC adds allegations claiming that the government has continued to intrude on the Ranch property without notice or permission since the FAC was filed.  In particular, the Ranch says that the government demolished some range fencing on Ranch property in the process of installing anti-erosion riprap, some of which extended over the Ranch property line with the Roosevelt Reservation.  See Pls.' Mot. to Amend Complaint, Ex. A ¶ 92.  The Ranch does not appear to dispute that this work took place as part of the government's remediation efforts while the parties were negotiating a settlement.  See Sep. 2025 Tr. at 7:11–8:8 (government counsel indicating this work was done as remediation); id. at 30:12–17 (counsel for the Ranch discussing the work without refuting the remedial nature of it).

The Court heard argument on the government's motion to dismiss and the Ranch's motion for leave to amend on September 4, 2025.  See Sep. 2025 Tr.

## II.    Standard of Review

When analyzing a motion to dismiss under Rule 12(b)(6), the Court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Giliana v. Blinken, 596 F. Supp. 3d 13, 17 (D.D.C. 2022) (Cooper, J.) (quoting Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000)).  However, a court need not accept inferences drawn by the plaintiff that are unsupported by facts alleged in the complaint, nor accept a plaintiff's legal conclusions as true.  Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)).

"The grant or denial of leave [to amend] lies in the sound discretion of the district court."

Pietsch v. McKissack & McKissack, 677 F. Supp. 2d 325, 328 (D.D.C. 2010) (citing Firestone v.

Firestone, 76 F.3d 1205, 1208 (D.C.Cir.1996)).  Although leave to amend is to be "freely given

when justice so requires," Firestone, 76 F.2d at 1208, denial of leave is warranted when

amendment would be "futile" because, among other reasons, it would "not survive a motion to

dismiss."  James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996).

### III.  Analysis

The remaining claims in the FAC allege violations of procedural and substantive due

process.  The Court will take each in turn, before considering whether the proposed amendments

in the SAC would be futile.

#### A.  Procedural Due Process

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . .

be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

Due process ensures that "a person in jeopardy of serious loss [is given] notice of the case

against him and opportunity to meet it."  Mathews v. Eldridge, 424 U.S. 319, 348 (1976)

(citation omitted).  The inquiry therefore has two parts: first, whether the plaintiff was deprived

of a property or liberty interest and, if so, "whether [he] received the process that was due."

Orange v. District of Columbia, 59 F.3d 1267, 1273 (D.C. Cir. 1995) (citation omitted).

Before assessing whether the Ranch has suffered a deprivation of property without due

process, the Court pauses to observe that the alleged deprivation here is of real property.  That

fact raises the question of whether the Ranch's allegations are properly considered under the

Fifth Amendment's Due Process Clause, as the Ranch suggests, or under its Takings Clause—

which is typically at play when private landowners claim that their real property has been taken

for public use.  The Court will therefore embark on a brief detour to consider the relationship

between the two clauses.

>    *1.  The Takings Clause and Due Process Rights*

The Ranch contends that the government "trespassed on" and "destroyed" its real

property during construction of the border wall, which is obviously a public works project.  FAC

¶ 2.  The government did so, the Ranch alleges, through physical trespasses by workers, blasting

activity that propelled rock debris onto the Ranch, and construction in the bed of Guadalupe

Creek that increased the risk of seasonal flooding on Ranch property.  Id.  ¶¶ 59, 61–66, 80–93.

These types of intrusions, depending on their nature and severity, could constitute a physical

taking of the Ranch's property for public use, see U.S. Const. amend. V, even though the

construction activity was almost entirely limited to public property.  See e.g., Ridge Line, Inc. v.

United States, 346 F.3d 1346, 1355–57 (Fed. Cir. 2003) (indicating that increased storm drainage

caused by a government construction project onto nearby private property could rise to the level

of a taking, as opposed to a tort, if it was (1) the "direct, natural, or probable result" of the project

and not "incidental or consequential" and (2) "substantial and frequent enough"); Arkansas

Game & Fish Comm'n v. United States, 568 U.S. 23, 34 (2012) (holding that recurring but

temporary floods may give rise to a takings claim); Pande Cameron & Co. of Seattle, Inc. v.

Cent. Puget Sound Reg'l Transit Auth., 610 F. Supp. 2d 1288, 1306–07 (W.D. Wash. 2009)

(determining that "dust and debris" generated by nearby construction did not constitute a taking

because they did not impose sufficient harm to private landowners' right to quiet enjoyment of

the property); Yamagiwa v. City of Half Moon Bay, 523 F. Supp. 2d 1036, 1106–09 (N.D. Cal.

2007) (holding that plaintiff plausibly alleged a taking when city knew in advance that its

construction activities would funnel enough rainwater and runoff onto private property to render it unusable).

Traditionally, however, the Supreme Court has made clear that the post-condemnation proceedings required by the Takings Clause also provide sufficient process under the Due Process Clause.  See e.g., Bragg v. Weaver, 251 U.S. 57, 62 (1919) (rejecting procedural due process challenge by landowner to the movement of earth from his property to build a public highway because "where adequate provision is made for the certain payment of compensation without unreasonable delay[,] the taking does not contravene due process of law . . . merely because it precedes the ascertainment of what process of what compensation is just."); Bailey v. Anderson, 326 U.S. 203, 205 (1945) ("[I]t has long been settled that due process does not require the condemnation of land to be in advance of its occupation by the condemning authority, provided only that the owner have opportunity, in the course of the condemnation proceedings, to be heard and offer evidence of the value of the land taken.").

This principle is no historical relic.  The Fourth Circuit more recently adhered to the above Supreme Court cases in Presley v. City of Charlottesville, 464 F.3d 480 (4th Cir. 2006). There, a landowner sued the City of Charlottesville, Virgina for publishing a local map that erroneously demarked a public hiking trail crossing her property, leading to repeated and disruptive trespasses.  Id. at 482–83.  Among other claims, the landowner contended that the city's failure to amend the map after learning of the error violated her procedural due process rights; the landowner did not plead a takings claim.  Id. at 489.  The district court dismissed the complaint for failure to state a claim, and the Fourth Circuit affirmed.  The circuit held that "[e]ven assuming that Presley suffered a deprivation in this case, . . . because the only deprivation that she has alleged is effectively a physical taking, an inverse condemnation action

for just compensation (which is clearly available to her under state law) provides all the process to which she is due." Id.  The court distinguished physical takings from other types of property deprivations given their "importance to governance and in the additional procedural protections provided whenever a taking occurs." Id.  Due to these differences, the court explained, "a century of precedent has created a distinct body of due process for cases like the present one in which the challenged deprivation is a physical taking.  Under these precedents, government entities need not provide a hearing before they physically take private property, so long as it is for public use." Id. at 489–90 (citing Bragg, 251 U.S. at 58, and Joslin Mfg. Co. v. City of Providence, 262 U.S. 668, 670, 678 (1923)).  "Nor need the government provide notice before effecting a physical taking." Id. at 490.  Accordingly, the court concluded that "when the alleged deprivation is effectively a physical taking, procedural due process is satisfied so long as private property owners may pursue meaningful postdeprivation procedures to recover just compensation." Id. (citing Bailey, 326 U.S. at 205, and Fulcher v. United States, 632 F.2d 278, 291 (4th Cir. 1980) (en banc) (Phillips, J., concurring) ("[T]here can be no questions of entitlement to due process notice as an incident to the prior taking by physical seizure; all the process due in respect of the right to compensation is supplied by the availability of the inverse condemnation cause of action." (alteration in original))).

The D.C. Circuit endorsed this principle in Delaware Riverkeeper Network v. FERC, 895 F.3d 102 (D.C. Cir. 2018), overruled on other grounds by Allegheny Def. Project v. FERC, 964 F.3d 1 (D.C. Cir. 2020) (en banc).  There, environmental groups brought a procedural due process claim in the district court on behalf of members who owned real property along the routes of proposed natural gas pipelines.  The Circuit affirmed the dismissal of the claim because, in the event the pipeline owners needed to acquire rights-of-way to any members'

property, affected landowners were entitled to just compensation following a hearing.  Id. at 110–11.  Citing Presley and Bailey, the circuit made plain that "[d]ue process requires no more in the context of takings where, despite Riverkeeper's suggestion to the contrary, there is no right to a pre-deprivation hearing."  Id. at 111; see also Roth v. King, 449 F.3d 1272, 1286 (D.C. Cir. 2006) ("[T]he fifth amendment employs two independent clauses to address two independent issues.  A claim of *deprivation* of property without due process of law cannot be blended as one and the same with the claim that property has been *taken* for public use without just compensation." (emphasis in original) (quoting Kizas v. Webster, 707 F.2d 524, 539 (D.C. Cir. 1983))).

The Supreme Court cases cited above, elucidated by Presley and endorsed by the D.C. Circuit in Delaware Riverkeeper, could be read to foreclose the Ranch's contention that similar types of real property "deprivations" are subject to a procedural due process claim seeking a pre-deprivation hearing and related equitable relief.  Rather, to the extent the Ranch has alleged what amounts to a taking—as opposed to a mere trespass or other non-intentional tort—this precedent might appear to suggest that its exclusive remedy is an inverse condemnation action for just compensation, which would be available to it under federal law.  See Presley, 464 F.3d at 490; see also Preseault v. I.C.C., 494 U.S. 1, 12–13 (1990) (holding that unless Congress has unambiguously withdrawn the Tucker Act inverse condemnation proceeding remedy for a would-be taking, a party must pursue that proceeding as a remedy).

Appearances may be deceiving, however, because two years after Delaware Riverkeeper, in fluttered the D.C. Circuit's decision in N. Am. Butterfly Ass'n v. Wolf, 977 F.3d 1244 (D.C. Cir. 2020) ("North American Butterfly").  In that case, the operator of a Texas wildlife sanctuary along the Mexican border brought a Fifth Amendment claim against the federal government—

framed at different points before the district court as both a due process violation and a taking[3]—stemming from the planned construction of a different segment of the border wall that would run through the Butterfly Association's property.  Id. at 1249.  The Butterfly Association alleged that CBP agents had effectively commandeered the sanctuary during the planning phase of the project by installing sensors, cutting down trees, widening roads, threatening to destroy locked gates, and barring employees and visitors from entering vast sections of the property.  Id. at 1250–51.

The district court dismissed the claim on ripeness grounds, but the D.C. Circuit reversed. Noting that the Butterfly Association had "disclaimed seeking 'recovery for a taking'" on appeal, the Circuit proceeded to analyze its claim under the rubric of procedural due process.  Id. at 1265.  The court first rejected the government's argument that the due process challenge was unripe because the government had not sought to acquire an interest in the property.  Id.  Rather, the court opined, "a [Fifth Amendment] deprivation occurs by virtue of the government's assertion of control, so a procedural due process claim may be ripe without the government having formally sought or acquired any property interest."  Id.  The court then held that the Butterfly Association had plausibly alleged such a deprivation "[w]ith allegations that government officials and contractors have entered the [sanctuary] to alter private roadways and install sensors, and that CBP has maintained an enduring presence at the [sanctuary] in connection with planned border-security infrastructure[.]"  Id. at 1267.  The Butterfly Association thus "state[d] a Fifth Amendment procedural due process claim based on DHS' allegedly unauthorized occupation and use of the Butterfly Association's land."  Id. at 1265.

---

[3] Compare Complaint, N. Am. Butterfly Ass'n v. Mayorkas, 17-cv-2651 (RJL), 2022 WL 20356841 (D.D.C. Feb. 17, 2022), ¶¶ 79–83 (alleging a due process violation) with Pl.'s Opp'n to Mot. to Dismiss, id., at 16–19 (arguing that the government's actions constituted a taking).

The Ranch asserts that <u>North American Butterfly</u> is "binding precedent" in this case. Pls.' Opp'n at 10.  Yet, in reaching its holding, the <u>North American Butterfly</u> panel did not engage with whether an inverse condemnation action would qualify as sufficient process for the alleged deprivation, as Supreme Court precedent holds and the D.C. Circuit confirmed in <u>Delaware Riverkeeper</u>.  (It appears that the government never argued that a post-condemnation proceeding would have been sufficient under the Due Process Clause; instead, it faulted the Butterfly Association for failing to identify what process was due.  The D.C. Circuit panel concluded that the government forfeited this argument by failing to raise it in the district court. <u>North American Butterfly</u>, 927 F.3d at 1267.)

And here, the Ranch does not grapple with the interplay of the two clauses either.  It makes no attempt to distinguish <u>North American Butterfly</u>'s endorsement of the plaintiff's due process claim from the rejection of those claims in the prior cases, despite some key similarities. For one, the prior cases involved similar types of alleged deprivations.  <u>See, e.g.</u>, <u>Presley</u>, 464 F.3d at 482–83 (repeated physical trespasses); <u>Bragg</u>, 251 U.S. at 58–59 (removal of dirt from property to support a government construction project).  For another, all the cases involve government projects that were intended to benefit the public and, as a result, all the plaintiffs presumably had traditional takings remedies available to them, at least at some point.  <u>See</u> <u>Coniston Corp. v. Vill. of Hoffman Ests.</u>, 844 F.2d 461, 474–75 (7th Cir. 1988) (Posner, J.) (suggesting that the Due Process Clause may provide protections for takings of property when they are not for public use and thus may not be covered by the Takings Clause).

Yet the Court sees at least two potential differences between <u>North American Butterfly</u> and the prior cases.  The first is timing.  On remand before the district court, the plaintiffs in <u>North American Butterfly</u> sought to amend their complaint.  In denying leave to amend, the trial

court contrasted the allegations in the original complaint, which it characterized as targeting the "*intermittent*[]" occupation of the plaintiff's property "pursuant to an established and *ongoing* Government policy" with those in the proposed amendment, which only described instances of *past* government conduct.  N. Am. Butterfly Ass'n v. Mayorkas, 17-cv-2651 (RJL), 2022 WL 20356841, at *5 (D.D.C. Feb. 17, 2022) (emphasis added).  The court reasoned that a procedural due process claim could be available under the earlier facts because "the nature and extent of the Government's takings or its potentially tortious conduct [could] not be reasonably determined" and, as a result, "post-deprivation remedies could well be inadequate."  Id.  By contrast, in Presley, the taking was complete and its scope clear with the publication of the misdrawn map. And while the takings in Riverkeeper and Bailey were prospective, the scope of the government's potential taking was reasonably known as well.

A second distinction may lie in the government's differing representations concerning the taking and the legal basis for its actions.  In North American Butterfly, the government had not indicated whether it had sought to acquire the land and offered no valid statutory basis for its supposedly temporary occupation.  977 F.3d at 1266.  By contrast, in Bragg, the government removed earth from the landowner's property pursuant to a statute that provided a clear description of the taking and basis for the government's actions.  251 U.S. at 58–59; see also Delaware Riverkeeper Network, 895 F.3d at 110 (laying out the process by which a taking would occur).  Thus, although the Takings Clause protects landowners both from permanent occupations and some temporary ones, there may be situations where it is not clear to a landowner whether the government's occupation will be permanent or only temporary.  See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982) (holding that a *permanent* physical occupation *authorized* by the government is a taking); Cedar Point Nursery

v. Hassid, 564 U.S. 139, 153–54 (2021) (explaining that temporary and intermittent invasions can give rise to a taking).  It could be that landowners facing that uncertainty are entitled to additional due process beyond just compensation hearings.  See N. Am. Butterfly Ass'n, 2022 WL 20356841, at *7 n. 3 (D.D.C. Feb. 17, 2022) ("The types of post-deprivation remedies available to [the Butterfly Association] that are adequate to redress the sporadic and intermittent deprivations alleged in the Second Amended Complaint would not be adequate to redress such a continuous—and continuously evolving—deprivation as that alleged in the First Amended Complaint.").

Considering these distinctions, the upshot of North American Butterfly may be that a due process claim seeking equitable relief is available to a landowner when the government maintains an "enduring"—but not permanent or altogether defined—presence on his property. But this reading is far from clear, and it may not fully accord with the rationale for the traditional rule governing the relationship between the Due Process and Takings clauses when it comes to government incursions on real property for public use.  That rule appears to be grounded not in timing or definiteness, but rather in the distinct purposes and protections associated with necessary government appropriations of real property for public use, on the one hand, and punitive deprivations of both real and other types of property as a sanction, on the other.[4]

---

[4]  Compare Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 537 (2005) (the Takings Clause "is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking" (cleaned up) and 7 Nichols on Eminent Domain [3] (2025) ("The takings protection focuses on the result of the government's action: whether the government has in effect appropriated private property for its own use, rather than merely regulating a private use of the property."), with United States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993) (the Due Process Clause's "purpose, more particularly, is to protect [the] use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property" (cleaned up)) and Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 38 (1997) (The Due Process Clause "by its inescapable terms, [] guarantees

The historical channeling of real property incursions to the Takings Clause sphere would seem to make sense from a practical standpoint, too.  Every public works project entails ongoing planning and construction activity.  Greenlighting procedural due process claims at the moment that activity arguably amounts to a downstream taking would allow landowners to circumvent the traditional bar on non-takings remedies for such government incursions.

All of this raises doubts in the Court's mind as to what extent North American Butterfly is controlling here.  Adding to the uncertainty is the fact that North American Butterfly is the only case cited by the Ranch where government conduct that almost certainly constitutes a taking—i.e., enduring physical presence on and control over private land for public purposes— has been held to give rise to pre-deprivation remedies.[5]

Ultimately, however, notwithstanding the Ranch's contentions, its allegations do not implicate North American Butterfly.  Again, North American Butterfly's specific holding is that "a [Fifth Amendment] deprivation occurs by virtue of the government's assertion of control, so a procedural due process claim may be ripe without the government having formally sought or acquired any property interest."  977 F.3d at 1265.  And the panel determined that the Butterfly Association had pled an "assertion of control" of its property through its allegation that the

---

only process.  Property can be taken by the state . . . but not without the process that our traditions require").

[5] The Court's independent research revealed one other case in which a court sanctioned a procedural due process claim stemming from an appropriation of private property for public benefit.  In Sinaloa Lake Owners Ass'n v. City of Simi Valley, a California water authority breached a private dam and drained 90% of the lake behind it to prevent flooding following heavy rains.  882 F.2d 1398, 1400–01 (9th Cir. 1989), overruled on other grounds by Armendariz v. Penman, 75 F.3d 1311 (9th Cir. 1996).  The Court explained that it "is of no moment that this due process claim is based on factors that also form the basis of an alleged taking.  Two or more legal theories may cover the same conduct and a plaintiff is entitled to prove each claim according to its terms."  Id. at 1404.  The Court proceeded to find that plaintiffs stated a claim under the Due Process Clause.

government had "maintained an enduring presence" on the land through a combination of intrusive activities.  Id. at 1267.

Here, by contrast, the Ranch nowhere alleges facts establishing that the government has "assert[ed] control over" or maintained an "enduring presence" on its land.  The Ranch's complaint alleges violations stemming from three categories of events: occasional trespasses by federal officials and contractors, FAC ¶¶ 59, 61, the construction in the bed of Guadalupe Creek that caused one flood and might lead to others, id. ¶¶ 80–89, and rock debris falling onto its land, id. ¶¶ 61–66, 88–93.  This is not occupation or assertion of control.  And the only allegation that comes close to describing an "enduring presence" is that some of the rock fall remains on the Ranch's property.  See Pls.' Opp'n at 18–19.  But leftover rocks—a physical consequence of completed government action—falls squarely within the domain of the Takings Clause, as do any floods that may occur after the construction due to the work previously done.  See Delaware Riverkeeper Network, 895 F.3d at 110–11; Ridge Line Inc., 346 F.3d at 1355–57 (Fed. Cir. 2003) (holding that storm run-off caused by a government construction project could constitute a taking under some circumstances); Arkansas Game & Fish Comm'n, 568 U.S. at 34 (2012) (holding that recurring but temporary floods may give rise to a takings claim).  And should the government's actions fall short of a taking, the FTCA is available as a remedy for any torts that might have occurred.  See Ridge Line Inc., 346 U.S. at 1355 ("'Inverse condemnation law is tied to, and parallels, tort law.'  Thus, not every 'invasion' of private property resulting from government activity amounts to an appropriation." (quoting 9 Patrick J. Rohan & Melvin A. Reskin, Nichols on Eminent Domain § 34.03[1] (3d ed. 1980 & Supp. 2002))).

In sum, to the extent North American Butterfly stands for the distinct proposition that landowners are entitled to due process beyond available just compensation proceedings under the

circumstances of that case, its holding does not apply here. The Court could therefore stop there and find that the Ranch must pursue other available remedies. See Preseault, 494 U.S. at 12–13 (holding that unless Congress has unambiguously withdrawn the Tucker Act inverse condemnation proceeding remedy for a would-be taking, a party must purse that proceeding); Simpkins v. D.C. Gov't, 108 F.3d 366, 371 (D.C. Cir. 1997) ("The FTCA [is] the exclusive remedy for such torts by government employees acting within the scope of their duties." (cleaned up)). But given its continuing uncertainty over the scope of North American Butterfly, the Court will proceed to analyze the Ranch's claim under customary due process standards.

      *2. Deprivation*

The first prong of the due-process inquiry is whether the Ranch has alleged a deprivation of a property interest. Again, the purported deprivations here stem from: (1) workers trespassing on the Ranch property; (2) construction on federal land in the bed of Guadalupe Creek; and (3) debris fall from the blasting activity on government property. To assess whether any of this conduct suffices, one must first define what it means to "deprive" someone of real property under the Due Process Clause. Is it the same thing as a taking? Or something more or something less? Neither party's briefing sheds much light on the relationship between the two, and the Ranch does not define what it believes qualifies as a deprivation in relation to damage to land. But the Court doubts that a physical intrusion of real property short of a taking would trigger due process. The Court will therefore assume that for damage to land to qualify as a deprivation, it must rise at least to the level of a taking.

Starting from the top, then, the infrequent physical trespasses described in the complaint do not constitute a deprivation. The FAC effectively pleads two sets of trespasses in five years: the first, on February 3, 2020, when federal agents and contractors allegedly entered the Ranch

property without consent, FAC ¶ 59, and the second, in July 2020, when "[h]eavy equipment drove on the Ranch property" and, on information and belief, "intrusions onto the Ranch's property" were frequent.  Id. ¶¶ 61, 95.[6]  The Ranch has since acknowledged that the second set of entrances in July were to remove rock debris following the Ranch's complaints.  Sep. 2025 Tr. at 40:24–41:7.  The Ranch does not indicate that these intrusions were ongoing past July 2020 or that any one of them was lengthy.  In the takings context, "isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right."  Cedar Point Nursery, 594 U.S. at 159; see also Hendler v. United States, 952 F.2d 1364, 1371 (Fed. Cir. 1991) (discussing the history of the Takings Clause and acknowledging that a government intrusion might be "so short lived" as to be more like the "tort of trespass than a taking of property").  The principle applies equally in the context of the Due Process Clause, as there is no *deprivation* of the owner's property when the government or its contractors enter the property on rare occasions for a brief amount of time. See Robbins v. BLM, 252 F. Supp. 2d 1286, 1299 (D. Wyo. 2003) ("Although the definition of deprivation under the Due Process Clause is somewhat elastic, at a minimum it connotes a loss . . . [and] trespass does not become a violation of the Fifth Amendment simply because it was committed by a federal official." (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577–79 (1972) and Daniels v. Williams, 474 U.S. 327, 332–33 (1986))).

Nor does the alleged construction in the bed of Guadalupe Creek constitute a deprivation of property under the Fifth Amendment.  In effect, the Ranch alleges that the environmental consequences of the government's work on federal land *near* the Ranch required the government

---

[6] The proposed SAC adds a couple more recent trespasses.  The Court will address those in its discussion of the Ranch's motion for leave to amend.

to obtain the Ranch's permission for its offsite labors.  See, e.g., Opp'n at 14.  But that turns the

Fifth Amendment on its head.  The Due Process Clause protects the right not to be deprived of

one's *own* property (or liberty) without process.  It does not create an affirmative right to prevent

the government from using *its* property how it sees fit, even if the government's choices *may*

have negative downstream consequences.  See O'Bannon v. Town Ct. Nursing Ctr., 447 U.S.

773, 789 (1980) ("[T]he due process provision of the Fifth Amendment does not apply to the

indirect adverse effects of governmental action.").  To be sure, offsite work that leads to the

ongoing or permanent loss of the property—say, by immediately flooding the land and rendering

it useless—could amount to a deprivation.  But the Ranch only alleges a brief flood on a

(seemingly public) access road attributed to debris buildup, FAC ¶ 85, the accumulation of

sediment on the access road due to the construction, id. ¶ 86, and a threat of future floods due to

changes in waterflow, id. ¶ 87.  To the Court's ear, that falls short of the type of property

deprivations the Due Process Clause is designed to protect.

Takings cases support this conclusion.  In Arkansas Game and Fish Com'n, the Supreme

Court outlined five factors for assessing whether flooding rises to the level of a taking: timing,

causation, intent or foreseeability, the "owner's reasonable investment-backed expectations"

regarding use, and "severity of interference."  In re Upstream Addicks & Barker (Texas) Flood-

Control Reservoirs, 138 Fed. Cl. 658, 665 (2018) (quoting Arkansas Game & Fish Comm'n, 568

U.S. at 38–39).  Applying these factors, one passing flood on an access road is not a deprivation.

If anything, it is more akin to a trespass (and may not even be that if the access road is indeed a

public road on state or federal property).  See Cedar Point Nursery, 594 U.S. at 160 (explaining

that the holding in Arkansas Game and Fish Com'n "reflects nothing more than an application of

the traditional trespass-versus-takings distinction to the unique considerations that accompany

temporary flooding"). Indeed, the Ranch stresses that the worst consequences of the government's work may come in the future. FAC ¶¶ 84, 88. If substantial floods on the Ranch's private road or property do ultimately occur because of government construction in the creek bed, the Ranch may eventually have a *takings* claim under Arkansas Game and Fish Com'n. But increases in the *risk* of flooding do not equate to a deprivation under the Due Process Clause.

Although the debris falls from blasting activity were allegedly more repeated and damaging to the Ranch's land than the trespasses and creek bed construction, the Ranch has also failed to plead a deprivation on that score. At no point does the Ranch identify what exactly it was deprived of due to the debris falls. See, e.g., id. ¶ 125 (noting the government had "caused tons of debris falls" without articulating its effect on its bundle of property rights). Though rock falls on a sufficient scale might conceivably result in a deprivation under the Due Process Clause, the Ranch has not indicated that these rocks did so. In its opposition to the motion to dismiss, for example, it simply calls the debris an "intrusion" and argues its "presence" warrants the same result as North American Butterfly. Pls.' Opp'n at 5, 18. There is no articulation of how the debris amounts to a deprivation. And what due process authority there is cuts against a finding of deprivation. In Sinaloa Lake Owners Association v. City of Simi Valley, the Ninth Circuit found a deprivation under the Due Process Clause where the government intentionally breached a community's private dam and drained 90% of its lake. 882 F.2d 1398, 1400–01 (9th Cir. 1989), overruled on other grounds by Armendariz v. Penman, 75 F.3d 1311 (9th Cir. 1996) (en banc). That is a far cry from government contractors neglecting to use best blasting practices, thereby causing rocks and dust to fall onto the Ranch's "rugged" and "remote" property in such a way that does not appear from the complaint to have meaningfully affected the Ranch's use of the land.

Here again, takings jurisprudence points in the same direction.  In Ridge Line, Inc., the Federal Circuit explained that "property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'"  346 F. 3d at 1355 (internal citation and quotations omitted).  Any failure by contractors to follow standard precautionary measures in connection with the blasting suggests that the debris falls—at least at the scale described—could not have been foreseeable to the government.  See FAC ¶¶ 66, 68.  And "[e]ven where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value."  Id. at 1356.  The Ranch has not pled any such loss.

Accordingly, the FAC does not allege a deprivation under the Due Process Clause.

### 3.  Adequacy of Post-Deprivation Remedies

The second step of procedural due process analysis is to determine whether the plaintiff received the process that was due.  The Court concludes that, even if the Ranch had sufficiently pled a deprivation, its claim would fail because the post-deprivation remedies available to it are sufficient to satisfy due process.

Due process may be satisfied by either pre-deprivation procedures or "adequate post-deprivation remedies."  Rason v. Nicholson, 562 F. Supp. 2d 153, 155 (D.D.C. 2008) (quoting Dickson v. Mattera, 38 Fed. App'x 21, 22 (D.C. Cir. 2002)).  Although pre-deprivation hearings are preferable, United States v. James Daniel Good Real Prop., 510 U.S. 43, 53 (1993), "[d]eprivation of property by a state employee does not constitute a violation of the procedural

requirements of the Due Process Clause of the [Fifth or] Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). "[W]here the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional 'advance procedural safeguards.'" Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 19 (1978) (citations omitted).

Here, the Ranch has acknowledged that the nature and extent of the damage to its property would not have been clear to the government at the outset of construction. See Sep. 2025 Tr. at 30:18–21 (counsel for the Ranch acknowledging that the government "may not have realized" its actions would impact the Ranch's property). In other words, insofar as construction deprived the Ranch of property, the government was unable to "anticipate" in advance what the specific deprivations would be. See Zinermon v. Burch, 494 U.S. 113, 132 (1990) (detailing that under some circumstances, when the government cannot anticipate a deprivation, a post-deprivation hearing might be sufficient). And that uncertainty would have made it nigh impossible to determine what form any pre-construction procedures would need to take, beyond the conversations that did occur between the parties, to satisfy due process. Any pre-deprivation hearing under these circumstances would therefore be "impractical." See Parratt v. Taylor, 451 U.S. 527, 538–39 (1981) (collecting cases in which post-deprivation remedies sufficed and explaining that the "impracticality" of pre-deprivation hearings is one reason). That is especially so given the Ranch's allegations that much of the alleged property damage resulted from contractors' failure to follow recognized construction practices. See FAC ¶¶ 66, 68; cf. Daniels, 474 U.S. at 333 (explaining that the Due Process Clause is not implicated by a "lack of due

care"). Further still, to the extent the Ranch contends it was entitled to a pre-construction hearing, including notice and advance consultation over potential collateral consequences, such a process strikes the Court as "unduly burdensome" in proportion to the property interest at stake here—damage to remote, uninhabited portions of land. Zinermon, 494 U.S. at 132. Considering the unforeseeable nature and scope of the deprivation in this case and the impracticality of a pre-construction hearing, the Court finds that the Ranch's due process claim fails so long as it has sufficient post-deprivation remedies.

And sufficient remedies are available here. Courts have recognized that a post-condemnation suit is sufficient process for a taking should the damage rise to that level. See supra, Part III(a)(1) (collecting cases); Presley, 464 F.3d at 489–91 (collecting cases). And an FTCA suit is sufficient process for any torts the governments may have committed. See, e.g., Mac'Avoy v. Smithsonian Inst., 757 F. Supp. 60, 69–70 (D.D.C. 1991); Timberline Nw., Inc. v. Hill, 141 F.3d 1179, at *4 (9th Cir. 1998); Rodriguez-Mora v. Baker, 792 F. 2d. 1524, 1527 (11th Cir. 1996).[7]

Indeed, on remand in North American Butterfly, the district court concluded that pre-deprivation remedies were not required for the allegations that the Butterfly Association sought to include in its amended complaint. The court explained that all the proposed allegations—including property damage, "invitations for others to enter the land," and "prohibition" of staff from entering parts of the land—involved "*past* instances of conduct" for which damages through either inverse condemnation proceedings or the FTCA would be sufficient to satisfy due

_____

[7] The Ranch suggested at the hearing that the FTCA does not provide a sufficient post-deprivation remedy because courts have found that some trespasses are not actionable under the FTCA. See Sep. 2025 Tr. at 48:25–49:6. But the fact that the FTCA may not cover every instance of trespass does not mean that it is an insufficient remedy.

process.  N. Am. Butterfly Ass'n, 2022 WL 20356841, at *4–6 (emphasis added).  The same goes for the past harms alleged here.

Perhaps recognizing that the Constitution does not require pre-deprivation process, the Ranch attempts to locate applicable procedural protections in the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA").  See Opp'n at 13–16.  Passed in 1995, the relevant provisions of IIRIRA require the government to acquire "easements as may be necessary" in the building of the border wall.  8 U.S.C. § 1103 note.  Here, however, the Ranch does not allege (or otherwise contend in its papers) that the government ever determined that it required an easement on the Ranch's land in order to complete construction of the adjacent wall segment.  IIRIRA's easement provision therefore does not apply.  Nor do other statutory requirements cited by the Ranch governing the negotiation of any property sales.  See Pls.' Opp'n at 14; 8 U.S.C. § 1103(b).  The Ranch retreats to arguing that, while it may not apply to this case directly, IIRIRA reflects Congress's judgment that the Due Process Clause requires the government to negotiate rights for all neighbors whose land might be affected by construction of the border wall.  Pls.' Opp'n at 15–16.  But, again, the Ranch's pleadings do not indicate that any easement or right-of-way was necessary to complete construction; all the allegations center on collateral damage from work that occurred on government property.  Thus, IIRIRA cannot be fairly read to express Congress's views on this inapposite scenario.

B.  Substantive Due Process

The Ranch also contends that the government violated its substantive due process rights. Substantive due process protects individuals against "arbitrary action of the government," Wolf v. McDonnell, 418 U.S. 539, 558 (1974), involving "the exercise of power without any reasonable justification in service of a legitimate governmental objective," Cnty. of Sacramento

26

v. Lewis, 523 U.S. 833, 846 (1998).  Substantive due process "prevents governmental power from being used for purposes of oppression . . . or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests."  Comm. of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 943–44 (D.C. Cir. 1988) (internal quotation marks and citations omitted).

"The threshold issue" for a substantive due process claim "is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  L'Association des Americains Accidentels v. U.S. Dep't of State, 633 F. Supp. 3d 74, 86 (D.D.C. 2022) (internal citation omitted), appeal dismissed, No. 22-cv-5262, 2023 WL 5321008 (D.C. Cir. Aug. 18, 2023).  There must be "grave unfairness."  Crockett v. D.C. Metro. Police Dept., 293 F. Supp. 2d 63, 68–69 (D.D.C. 2003) (citing Tri Cnty. Indus., Inc. v. District of Columbia, 104 F.3d 455, 459 (D.C. Cir. 1997)).  "There are two ways in which a plaintiff might meet the 'grave unfairness' requirement: (1) a substantial infringement of the law prompted by personal or group animus, or (2) a deliberate flouting of the law that trammels significant personal or property rights."  Crockett, 293 F. Supp. 2d at 69 (quoting Tri Cnty. Indus., 104 F.3d at 459).

The Ranch pleads no facts that satisfy the "high bar" of the "'shock the conscience' standard."  Johnson v. District of Columbia, 490 F. Supp. 3d 144, 160 (D.D.C. 2020) (quoting Ali v. Trump, 959 F.3d 364, 369 (D.C. Cir. 2020).  The collateral debris falls, inattention to environmental consequences, potentially bad-faith negotiations, and two sets of trespass may be unneighborly.  But none of the facts pled suggest they were animated by animus or resulted from a deliberate flouting of the law.  See N. Am. Butterfly Ass'n, 2022 WL 20356841, at *6 ("[H]arass[ing] or interfer[ing] with [Butterfly Association] staff and visitors, as well as

enter[ing], assert[ing] control over, or caus[ing] some damage to [the Butterfly Association's] property . . . would be troubling, but that is not the standard for a cognizable substantive due process claim."). The alleged conduct therefore does not shock the conscience in violation of the Ranch's substantive due process rights.

C. Motion to Amend

Finally, the Ranch has moved for leave to file a second amended complaint. Because the proposed amendments do not include facts that would allow the Ranch's claims to survive a motion to dismiss, the Court denies the motion.

The SAC adds allegations that government contractors trespassed on Ranch property and "demolished portions of its range fence" in the process of installing "riprap for damage and erosion control" along the perimeter of the border wall construction site. See Pls.' Mot. to Amend Complaint, Ex. A ¶ 92. According to the Ranch, part of the riprap extended about 20 feet over the property line between the Ranch and the Roosevelt Reservation. Id. at ¶¶ 92–96 (including aerial photographs). The Ranch does not dispute that this activity occurred as a part of the government's efforts to mitigate the effects of its previous work in the area while the parties were in settlement negotiations—efforts that would seem consistent with the equitable relief the Ranch seeks in this case. In any event, these new allegations do not state a due process violation for the same reasons discussed above. There is no indication of control or enduring presence by the government, so North American Butterfly does not apply. And the Ranch has adequate post-deprivation remedies if the government committed a tort (by failing to confine its activities to federal property and tearing down some fencing) or effected a taking (by appropriating a sliver of the Ranch's property in the process of installing the riprap).

Accordingly, the proposed amendments are futile because they would not survive a motion to dismiss, and leave to amend is denied.  See James Madison Ltd. by Hecht, 82 F.3d at 1099.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant the Defendants' Motion to Dismiss.  A separate Order shall accompany this Memorandum Opinion.


                                                _____

                                                CHRISTOPHER R. COOPER
                                                United States District Judge

Date:  September 29, 2025